$51 \; 530$

1    <u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

2    Name ___GUZMAN, JOSE___

            (Last)            (First)            (Initial)

3
      Prisoner Number ___E-53800___

4
      Institutional Address _P.O. BOX 689, SOLEDAD, CA 93960-0689_

5

6    ══════════════════════════════════════════════

7                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**

8    ___JOSE GUZMAN,___
      (Enter the full name of plaintiff in this action.)

9
                    vs.                        Case No. _____

10                                              (To be provided by the clerk of court)
      ___BEN CURRY, WARDEN,___

11    _____      **PETITION FOR A WRIT**
                                        **OF HABEAS CORPUS**

12    _____

13    _____

14    (Enter the full name of respondent(s) or jailor in this action)

15

16    ══════════════════════════════════════════════
                    <u>Read Comments Carefully Before Filling In</u>

17    <u>When and Where to File</u>

18          You should file in the Northern District if you were convicted and sentenced in one of these

19    counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20    San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21    this district if you are challenging the manner in which your sentence is being executed, such as loss of

22    good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24    one of the above-named fifteen counties, your petition will likely be transferred to the United States

25    District Court for the district in which the state court that convicted and sentenced you is located. If

26    you are challenging the execution of your sentence and you are not in prison in one of these counties,

27    your petition will likely be transferred to the district court for the district that includes the institution

28    where you are confined. Habeas L.R. 2254-3(b).

1    Who to Name as Respondent

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now and the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1.  What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):

14             SUPERIOR COURT                      LOS ANGELES

15             Court                               Location

16             (b)    Case number, if known _____A980858_____

17             (c)    Date and terms of sentence ___April 26, 1990  /  17 years to life___

18             (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                    parole or probation, etc.)          Yes _X_    No ____

20                    Where?

21                    Name of Institution: _Correctional Training Facility-Soledad_

22                    Address: _P.O. Box 689, Soledad, CA 93960-0689_

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   _187 PC w/ 12022.5(a) and 245(a)(1)_

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1    3. Did you have any of the following?

2        Arraignment:                          Yes __X__    No ____

3        Preliminary Hearing:                  Yes __X__    No ____

4        Motion to Suppress:                   Yes __X__    No ____

5    4. How did you plead?

6        Guilty ____    Not Guilty _X_    Nolo Contendere ____

7        Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9        Jury __X__    Judge alone____    Judge alone on a transcript ____

10   6. Did you testify at your trial?               Yes __X__    No ____

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment                    Yes __X__    No ____

13       (b)    Preliminary hearing            Yes __X__    No ____

14       (c)    Time of plea                   Yes __X__    No ____

15       (d)    Trial                          Yes __X__    No ____

16       (e)    Sentencing                     Yes __X__    No ____

17       (f)    Appeal                         Yes __X__    No ____

18       (g)    Other post-conviction proceeding    Yes ____    No _X_

19   8. Did you appeal your conviction?             Yes ____    No ____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal               Yes ____    No ____

22              Year: _____    Result:_____

23              Supreme Court of California    Yes ____    No ____

24              Year: _____    Result:_____

25              Any other court               Yes ____    No ____

26              Year: _____    Result:_____

27

28       (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1    petition?                                      Yes _____    No_____

2    (c)    Was there an opinion?                  Yes _____    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                   Yes _____    No_____

5         If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?              Yes _____    No_ X _

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding. Attach extra paper if you need more space.

18          I.    Name of Court: __CALIFORNIA SUPREME COURT__

19                Type of Proceeding: __HABEAS CORPUS__

20                Grounds raised (Be brief but specific):

21                a.___SAME AS HERE_____

22                b._____

23                c._____

24                d._____

25                Result: __DENIED_____    Date of Result: _3/19/08_

26          II.   Name of Court: _____

-27               Type of Proceeding: _____

28                Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1                     a._____

2                     b._____

3                     c._____

4                     d._____

5                     Result: _____Date of Result:_____

6           III.    Name of Court: _____

7                    Type of Proceeding: _____

8                    Grounds raised (Be brief but specific):

9                     a._____

10                    b._____

11                    c._____

12                    d._____

13                    Result: _____Date of Result:_____

14           IV.    Name of Court: _____

15                    Type of Proceeding: _____

16                    Grounds raised (Be brief but specific):

17                     a._____

18                    b._____

19                    c._____

20                    d._____

21                    Result: _____Date of Result:_____

22      (b)     Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                               Yes_____    No_____

24               Name and location of court: _____

25   **B. GROUNDS FOR RELIEF**

26        State briefly every reason that you believe you are being confined unlawfully. Give facts to

27 support each claim. For example, what legal right or privilege were you denied? What happened?

28 Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One:_____ SEE ATTACHED _____

6  _____

7      Supporting Facts:_____ SEE ATTACHED _____

8  _____

9  _____

10  _____

11      Claim Two:_____

12  _____

13      Supporting Facts:_____

14  _____

15  _____

16  _____

17      Claim Three:_____

18  _____

19      Supporting Facts:_____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that the

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasonin

3    of these cases:

4    _____

5    _____

6    _____

7    Do you have an attorney for this petition?                                    Yes____        No  X

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled i

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on  4 - 1 - 08

14              Date                                              Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _____ JOSE GUZMAN _____, declare:

I am over 18 years of age and a party to this action. I am a resident of _____

_____ CORRECTIONAL TRAINING FACILITY-SOLEDAD _____ Prison,

in the county of _____ MONTEREY _____,

State of California. My prison address is: P.O. BOX 689, SOLEDAD, CA 93960 ,

_____.

On _____ 4/1/08 _____,
                                   (DATE)

I served the attached: _____ PETITION FOR WRIT OF HABEAS CORPUS _____

_____
(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

OFFICE OF THE ATTORNEY GENERAL
455 GOLDEN GATE AVE., SUITE 11000
SAN FRANCISCO, CA 94102-7004

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on 4-1-08
          (DATE)

_Jose Guzman_
(DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)
                                                    ::ODMA\PCDOCS\WORDPERFECT\22832\1
                            -9-

**Name: GUZMAN, J.**                                    **CDC No: E53800**

**Ethnicity** MEX    **Custody Level:** MEDA    **Work/Priv. Group:** A1A    **WorkGroup Date:** 5/6/1992

**Housing:** FW-205L, CF          **Bed in Date:** 2/25/2007

**Arrived at CTF:** 6/26/1995     **From:** PVP

**Position No:** ABEAC.617    **Job Title:** A3-2 STUDENT

**RDO:** S SUH          **Work Hours:** 0800-1130, 1230-1530          **Date Assigned:** 10/3/2002

**True Ethnicity** MNA          **Affiliation:** N / A

**CCCMS/EOP:**    **H/C:** No    **DPP:**          **DDP:**          **DOB:** 09/28/30    **Age:** 77

**Lifer:** Yes    **3SK:** No    **PV-RTC:** No    **Sgl-Cell:** No    **RTQ:** No

**Loss of Privileges**                    **Loss of Contact Visits:**

**Loss of Visits:**          **CTQ:**                    **Extra Duty:**                    **Hours:**

**Mandatory Random Drug Testing:**                    **Times per Month:**

**Cleared for:**    **Central:** No    **East:** No    **North:** No    **South:** No    Central Only: No    North Only: No

S156839

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re JOSE GUZMAN on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750.)

SUPREME COURT
**FILED**

MAR **1 9** 2008

Frederick K. Ohlrich Clerk

---

Deputy

GEORGE
---
Chief Justice

Name _____ JOSE GUZMAN _____

Address _____ P. O. BOX 689   FW-205L _____

_____ SOLEDAD, CA 93960-0689 _____

MC-275

CDC or ID Number _____ E53800 _____

CALIFORNIA SUPREME COURT

_____
(Court)

| | **PETITION FOR WRIT OF HABEAS CORPUS** |

JOSE GUZMAN, _____
Petitioner

vs.

BOARD OF PAROLE HEARINGS, _____

Respondent

No. _____
*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

**PETITION FOR WRIT OF HABEAS CORPUS**

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction                    ☒ Parole

☐ A sentence                     ☐ Credits

☐ Jail or prison conditions      ☐ Prison discipline

☐ Other *(specify)*: _____

1. Your name: _____ JÓSE GUZMAN

2. Where are you incarcerated? _____ CTF-SOLEDAD

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through C to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   ___SECOND DEGREE MURDER / ASSAULT WITH A DEALY WEAPON___

   _____

   b. Penal or other code sections: ____187 PC w/ 12022.5 and 245(a)(1)_____

   c. Name and location of sentencing or committing court: _____

   _____LOS ANGELES SUPERIOR COURT_____

   d. Case number: _____A980858_____

   e. Date convicted or committed: _____APRIL 26, 1990_____

   f. Date sentenced: _____

   g. Length of sentence: _____17 YEARS TO LIFE_____

   h. When do you expect to be released? _____

   i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

   _____

   _____

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

**6. GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE BOARD OF PRISON TERMS ILLEGALLY USED PC 3041(b) [THE EXCEPTION] TO

FIND PETITIONER UNSUITABLE FOR PAROLE. THE DECISION WAS ARBITRARY AND

CAPRICIOUS IN DIRECT VIOLATION OF PETITIONER'S STATE AND FEDERAL DUE

PROCESS RIGHTS. THERE IS NO EVIDENCE THAT PETITIONER IS A CURRENT THREAT

a. Supporting facts:                                                      cont. on attached

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

Petitioner is a 77 year old illegal alien who is subject to deportation.

He is being denied parole based on the commitment offense and unreason-

able demands for a man his age that he upgrade educationally and

vocationally. He does not speak or understand English. He just wants

to go back to Mexico and die in peace surrounded by his loved ones.

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Biggs v. Terhune (2003) 334 F.3d 910

**THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE §
3041(b) [THE EXCEPTION] TO FIND PETITIONER UNSUITABLE FOR
PAROLE. THE DECISION WAS ARBITRARY AND CAPRICIOUS IN DIRECT
VIOLATION OF PETITIONER'S STATE AND FEDERAL DUE PROCESS
RIGHTS. THERE IS NOT A MODICUM OF EVIDENCE THAT PETITIONER
IS A CURRENT THREAT TO SOCIETY OR UNSUIATBLE FOR PAROLE.**

On September 13, 2005, Petitioner Jose Guzman, [hereinafter "Petitioner"], was provided

a Life Term Parole Consideration Hearing before the Board of Parole Hearings [hereinafter

"Board;" please refer to Exhibit "A," which is the Hearing Transcript, hereinafter "HT."]

Said Board hearing was Petitioner's fifth (5th) parole suitability hearing. Petitioner's

minimum eligible release date was April 27, 2000.[1] The purpose of this Board hearing was to set

Petitioner's term uniformly[2] to his offense and for a finding of suitability for parole (please see

Penal Code § 3041.5; In re Edward Ramirez, 94 Cal.App.4[th] 541 (2001); McQuillion v. Duncan

(2002 9th Cir.) 306 F.3d 895; In re Norman G. Morrall, (2002) 102 Cal.App.4[th] 280; In re

Rosenkrantz, (2002) 29 Cal.4[th] 660; In re Mark Smith, (2003) Cal.App.4[th] 343; and the recent

Biggs v. Terhune (2003 9th Cir.) 334 F.3d 910.

The consequent result of this Board hearing was an erroneous and unlawful finding of

unsuitability and a release date was not set. Petitioner was given a one (1) year denial and did not

appeal this decision through Administrative remedy because the Board of Parole Hearings has

eliminated the BPH Appeals Unit and no longer allows for the filing of administrative appeals on

BPH denials of parole for indeterminately sentenced prisoners such as myself. Petitioner submits

that the Board's regulation, that is the California Code of Regulations (herein "CCR"), § 2402

(a), **DEMANDS that the Board set a release date unless Petitioner CURRENTLY presents**

---

[1] - The Court of Appeal in In re George Scott (2004) 119 Cal.App.4[th] 871, reaffirmed the rationale of the Ramirez and Smith courts when it declared "…parole is the **rule**, rather than the exception, and conviction for second degree murder does not automatically render one unsuitable. (In re Smith (2003) 114 Cal.App.4[th] 343, 366; In re Ramirez, supra, 94 Cal.App.4[th] 549 "…[a]ll violent crimes demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving indeterminate sentences. Pen. Code § 3000, subd. (b) (1)"). And the legislature has clearly expressed its intent that when murders – who are the great majority of inmates serving indeterminate sentences – "approach their minimum eligible parole date, the Board shall normally set a parole release date …" (id. at p. 570).

[2] The Court of Appeal,on June 24, 2004, in In re George Scott, supra, 119 Cal.App.4[th] at 887 fn.7, also reaffirmed the Legislative Intent of Uniform Terms by stating: "The first two sentences of the DSL declare 'that the purpose of imprisonment is punishment' and that '[t]his purpose is best served by terms proportionate to the seriousness of the offense with provisions for uniformity in the sentences of offenders committing the same offense under similar circumstances. (Penal Code § 1170, subd. (a) (1).) Nothing in the DSL or its legislative history suggests that legislative concern with uniformity was limited to those serving determinate terms. Penal Code 3041 shows that this interest does extend to individuals such as [petitioner] who are serving indeterminate life terms. (id., citing, Ramirez, supra, 94 Cal. App. 4th at 559.)"

**a risk of danger to the public**. Petitioner submits that the representing District Attorney did not provide any new and/or additional evidence whatsoever that Petitioner was an unreasonable risk, a danger to the public, or otherwise unsuitable for parole.

Additionally, Petitioner submits that the Board speaks in meaningless generalities and fails to address the exact nature of Petitioner's CURRENT character. By not doing so, the Board violates the intent and spirit of Penal Code (herein "PC") § 3041.5[3] and In Re Ramirez, supra, which dictates that "[T]he Board shall NORMALLY set a parole release." (Citing Biggs v. Terhune, et al., supra).

The court in Biggs, supra, held that the Board's continued use of the crime as a basis for denial of parole violates both State and Federal due process. For the past seventeen years (17) Petitioner has had no occurrence of serious violent disciplinary action, thus exemplifying himself as a model prisoner. Petitioner seeks acknowledgement of the facts that since 1990 there have thereafter a continuous seventeen (17) years of disciplinary free action and/or occurrence. Petitioner submits that the Board's failure to uniformly measure his offense and setting his term proportionately to others similarly situated, and to find him suitable for parole, violates both State and Federal due process. Also, the current policy of the Board, which will be discussed more fully infra, is the setting of a parole date which is all too often the exception rather than the norm, and thus violates the Petitioner's liberty interest that is present in a parole date. In Re Rosenkrantz, supra; McQuillion v. Duncan, supra; Biggs v Terhune, et al., supra. At the Petitioner's Board hearing, the Board relied **SOLELY** on the commitment offense and alleged limited programming to justify its unlawful finding of suitability. Beginning at HT, pg. 47, the Board stated:

"...you are not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison ... the first thing that we considered was Mr. Guzman's commitment offense ... This prisoner doesn't have any prior convictions ... However, he did come to the US illegally ... He's programmed in a limited manner ... The most recent psych evaluation is dated 8/28/03. It's by Dr. Hewchuck. And it is favorable ... Says he

---

[3] There is no evidence that the crime is "particularly egregious" to justify the use of the exception of PC § 3042 (b); In In Re Norman Morrall, supra, the court concluded: "[W]e agree that an inmate cannot be denied parole simply on the type of offense committed." (See In Re Minnis, 7 Cal. 3d at pg. 647). To the contrary, it falls squarely in the Board's own proportionality matrix "B-II [17-18-19]." Without post-conviction credits the Petitioner has served seventeen (17) years ... given post-conviction credits – 22 plus years- exceeding his matrix by three (3) years. There is no evidence that Petitioner is a current risk or threat to society and the Board's conclusions are not supported by the record (See Biggs, supra.)

has good insight into his prior behavior and is fully remorseful for his offense. Says Mr. Guzman is appropriate for release with negligible probability of recidivism. **And I would respectfully disagree with Dr. Hewchuck**. Mr. Guzman does have parole plans for Mexico ..."

Yet, and with regard to Petitioner's suitability, even though the Board found in it's conclusions that Petitioner's Psychiatric Report was supportive of release (please refer to HT pg. 50-1), the Board says Petitioner lacks insight and needs to upgrade educationally and vocationally. Petitioner's Psychiatric Reports have been much to the contrary, and specifically, Dr. Hewchuck stated:

"There have been few changes since Inmate Guzman's prior psychological assessment completed by Dr. Terrini in 1998. He has maintained full institutional compliance, and there is no evidence of any disciplinary action throughout his entire incarceration ... Inmate Guzman does not fit the stereotype of habitual criminal. Due to his advanced age, and total institutional compliance during incarceration, he poses an extremely low risk if released to the community. He has good insight into his prior behavior, and is fully remorseful for his offense. Due to low risk factors, and close family support, Inmate Guzman is appropriate for release, with a negligible probability of recidivism."

And again, under "Assessment of Dangerousness," Dr. Hewchuck stated: **"Due to his advanced age, and total institutional compliance during incarceration, he poses an extremely low risk if released to the community**."

Additionally, the Board ignored that Petitioner has been deemed by the California Department of Corrections and Rehabilitation a **Model** prisoner with A-1A status, and NOT a threat to society, and further ignored that Petitioner's crime is not "particularly egregious" by placing Petitioner in a Level II prison setting.[4]

Again, in In Re Norman Morrall, supra, the Court concluded: "A refusal to consider the particular circumstances relevant to an inmate's individual suitability for parole would be

---

[4] California Code of Regulations, Title 15, section 3375.2 subd. (7)(A) states: "An inmate serving any life term shall not be housed in a Level I or II facility if any of the following case factors are present: The Commitment offense involved ...unusual violence..." And on June 24, 2004, the Court of Appeal in In Re George Scott, supra, 119 Cal.App.4[th] at 892 fn.11, found that the Board's regulations provide that even if the crime is "exceptionally callous" an inmate may be found suitability for parole. The Court declared that, "Under the Board regulations, base terms for life prisoners are not calculated until after an inmate is deemed suitable for release. (§ 2282, subd. (a).) The regulations therefore contemplate that an inmate may be deemed suitable for release even though his offense demonstrated 'exceptionally callous disregard for human suffering.' (§ 2402, subd. (c)(1)(D).)" (id)

contrary to law." Moreover, the Court in <u>Biggs</u>, supra, addressed the Board's continued illegal usage of the crime and/or prior history to justify a denial of parole:

> "...a continued reliance...on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (<u>Biggs</u>, supra, 334 F.3d at 917).

In <u>Biggs</u>, supra, the appeal was pursuant to his initial suitability hearing. The Petitioner has now had five (5) Board hearings and submits that his most recent denial rests solely on the commitment offense, and therefore violates both State and Federal due process. More importantly, there is no evidence that the public requires a lengthier period of incarceration (please refer to PC § 3041 (b)) in relation to other instances of the same crime (please refer to § 3041.5).

Petitioner submits that understanding and perspective of the crime is compelled by the Board's own proportionately set matrix (please refer to CCR Division 2, § 2403(c)). The matrix scale and rating of the more common and routine variations of murder appear to be codification of when a crime of this nature can be more egregious than average. Petitioner submits that his crime falls squarely in the matrix [category of "B-II" (17-18-19). With post-conviction credits, Petitioner has exceeded the matrix by more than three (3) years – and without post-conviction credit application, the Petitioner has served his matrix. The Board fails in any attempt to substantiate why Petitioner's crime is so heinous as to require that Petitioner be expected time and again from the general rule that a parole date shall normally be set. Please see <u>In Re Ramirez</u>, supra, wherein the court states:

> "The Board must weigh the inmate's criminal conduct not against ordinary social norms, but against instances of the same crime or crimes. (<u>Ramirez</u>, supra, 94 Cal.App.4[th] at p. 570)."

Petitioner submits that the record is devoid of the Board making such a comparison. Similarly, Petitioner's Psychiatric Report evidence, like <u>Biggs</u>, supra, is supportive of release contrary to the Board's erroneous and specious findings (please see Exhibit "6"). The court in <u>Biggs</u>, addressed the Board's illegal usage of needed therapy and other illegal reasons to justify a highly illegal denial; the Court concluded:

> "The record in this case and the transcript of Biggs' hearing before
> the Board clearly show that many of the conclusions and factors
> relied on by the Board were devoid of evidentiary basis." (Biggs, supra,
> 334 F.3d at p. 915)

The Court in Biggs, supra, went on to warn the Board that while there was "some evidence" to use the crime as a basis for denial at his initial hearing, the Board's continued use of the crime as a basis for continuous denials would be violative of Biggs' Federal due process rights. Petitioner submits that the Board's sole usage of the initial commitment offense and/or alleged limited programming, as continued basis to deny him a parole date, has violated his 5th and 14th Amendment rights under the United States Constitution to not be deprived of his liberty. The Court in Biggs, supra, also held:

> "[T]o ensure that a state created parole scheme serves the public
> interest purposes of rehabilitation and deterrence, the Parole Board
> must be cognizant not only of the factors required by state statue to
> be considered, but also the concepts embodied in the Constitution
> requiring due process of law ..." [please see e.g., Greenholtz,
> 442 U.S. at 7-8]. Biggs, supra, 334 F.3d at p. 916.

> "The Parole Board's sole supportable reliance on the gravity of the
> offense and conduct prior to imprisonment to justify denial of parole
> can be initially justified as fulfilling the requirements set forth by
> state law. Over time however, should Biggs continue to demonstrate
> exemplary behavior and evidence of rehabilitation, denying him a
> parole date simply because of the nature of his offense and prior
> conduct would raise serious questions involving his liberty interest in
> parole ..." (id.)

Petitioner also submits that the Board has adopted an anti and/or "no parole" policy per se, or a policy of under-inclusion demonstrating a policy of systematic bias; granting on an approximate 232 parole dates out of over 11,000 Board hearings, thus violating the legislative intent of PC § 3041.5, that "... a parole release date shall normally be set in a manner that will provide uniform terms for offenders with crimes of similar gravity and magnitude ..." and, Petitioner's State and Federal due process rights as well (please refer to In re Ramirez, supra, pg. 565). Petitioner contends that the evidenced behavior by a quasi-judicial Board, of policy demonstrating an approximate 98.5% denial rate, supports the premise that such a policy exists

(i.e., anti and/or "no parole" policy, or, a policy of under-inclusion or systematic bias). This policy violates the strictures of substantive due process.

The existence of said policy in denying parole may explain why the Board only grants parole in less than two (2) percent of the cases it hears; it also explains the bias demonstrated in the present case.

In this case, Petitioner's own circumstance, and the Board's pronouncement of numerous and unlawful conclusions is not supported by the evidence, and violates the process due Petitioner under both the State and Federal Constitutions. Based upon the herein demonstrated bias, the Board's decision cannot be shielded by the "some evidence" standard. The only appropriate standard is independent review.

## CONCLUSION

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing, nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious (due to the Board carrying out it's political function of adhering to a "no parole" policy), due to the Board's acting contrary to the intent and spirit of PC § 3041(b), and, due to its refusal to adhere to aforementioned decisions and the controlling authorities.

The Petitioner prays this Court order him discharged and/or released, or at the very least, direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

7. **Ground 2 or Ground** _____ (if applicable):

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

**PETITION FOR WRIT OF HABEAS CORPUS**

8.  Did you appeal from the conviction, .tence, or commitment? ☐ Yes. ☐ No. If , give the following information:
    a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
        ___NO DOCUMENTATION IS AVAILABLE___

    b.  Result: _____ c.  Date of decision: _____

    d.  Case number or citation of opinion, if known: _____

    e.  Issues raised: (1) _____

        (2) _____

        (3) _____

    f.  Where you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

        _____

9.  Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:

    a.  Result: _NO DOCUMENTATION IS AVAILABLE_  b. Date of decision: _____

    c.  Case number or citation of opinion, if known: _____

    c.  Issue raised: (1) _____

        (2) _____

        (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    _____

    _____

11. Administrative Review:
    a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious.  (See *in re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal. Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

        _ADMINISTRATIVE REVIEW IS NOT AVAILABLE_____

        _____

        _____

        _____

        _____

        _____

    b.  Did you seek the highest level of administrative review available? ☐ Yes. ☒ No.
        *Attach documents that show you have exhausted your administrative remedies.*

**PETITION FOR WRIT OF HABEAS CORPUS**

12. Other than direct appeal, have you had any other petitions, applications, or motions respect to this conviction, commitment, or **issue** in any court?   [x] Yes. If yes, continue with number 13.   [ ] No. If no, skip to number 15.

13. a. (1) Name of court: ___ CALIFORNIA SUPREME COURT

    (2) Nature of proceeding (for example, "habeas corpus petition"): ___ HABEAS CORPUS ___ S148502

    (3) Issues raised: (a) ___ 6TH AMENDMENT CLAIM

    (b) _____

    (4) Result *(Attach order or explain why unavailable):* ___ DENIED

    (5) Date of decision: ___ MAY 9, 2007

  b. (1) Name of court: ___ NORTHERN DISTRICT COURT – FEDERAL

    (2) Nature of proceeding: ___ HABEAS CORPUS – No. C 07-3051 SI

    (3) Issues raised: (a) ___ 6TH AMENDMENT CLAIM

    (b) _____

    (4) Result *(Attach order or explain why unavailable):* ___ DISMISSED WITH LEAVE TO AMEND

    (5) Date of decision: ___ JULY 30, 2007

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

    THERE IS NO DELAY

16. Are you presently represented by counsel?   [ ] Yes.   [x] No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?   [ ] Yes.   [x] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 9 – 26 – 07

▶ _(signature)_ (SIGNATURE OF PETITIONER)

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____ Jose Guzman _____, declare:

I am over 18 years of age and I am party to this action.  I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California.  My prison address is:

_____Jose Guzman_____, CDCR #: _E-53800_
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _FW-205U_
SOLEDAD, CA  93960-0689.

On _____, I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined.  The envelope was addressed as follows:

Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Executed on _9-26-07_.

Jose Guzman
X _Jose Guzman_
Declarant

S148502

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re JOSE GUZMAN on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
# FILED

MAY – **9** 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8   JOSE GUZMAN,                              No. C 07-3051 SI (pr)

9          Petitioner,                        **ORDER OF DISMISSAL WITH**
                                              **LEAVE TO AMEND**
10       v.

11  BEN CURRY, warden,

12         Respondent.
                                      /
13

14                              **INTRODUCTION**

15       Jose Guzman, an inmate at the Correctional Training Facility in Soledad, filed this pro

16  se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition is now

17  before the court for review pursuant to 28 U.S.C. §2243 and Rule 4 of the Rules Governing

18  Section 2254 Cases. His in forma pauperis application also is before the court for consideration.

19

20                              **BACKGROUND**

21       Guzman was convicted in the Los Angeles County Superior Court of second degree

22  murder and was found to have used a firearm in the offense. In 1990, he was sentenced to 15

23  years to life in prison plus two years. His petition does not challenge his conviction but instead

24  challenges a decision by the Board of Parole Hearings ("BPH") at a September 13, 2005 hearing

25  that found him not suitable for parole. Guzman states that he presented his claims in a state

26  habeas petition to the California Supreme Court before he filed this action.

27

28

For the Northern District of California

United States District Court

1

**DISCUSSION**

2  A.    Standard of Review

3        This court may entertain a petition for writ of habeas corpus "in behalf of a person in
4  custody pursuant to the judgment of a State court only on the ground that he is in custody in
5  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A
6  district court considering an application for a writ of habeas corpus shall "award the writ or issue
7  an order directing the respondent to show cause why the writ should not be granted, unless it
8  appears from the application that the applicant or person detained is not entitled thereto." 28
9  U.S.C. § 2243.  Summary dismissal is appropriate only where the allegations in the petition are
10 vague or conclusory, palpably incredible, or patently frivolous or false.  See Hendricks v.
11 Vasquez, 908 F.2d 490, 491 (9th Cir. 1990).

12

13 B.    Claims

14        1.    Right To Jury Trial

15        Guzman contends that his Sixth Amendment right to a jury trial was violated by "the
16 Board's commissioner sentencing of petitioner to more than three years above the 228 months
17 statutory maximum of the standard range for his offense, on the basis of sentencing
18 commissioner finding that the commitment offense was carried out 'in an especially heinous,
19 atrocious, or cruel manner.'"  Petition, p. 7 (errors in source).  The claim is somewhat ill-defined
20 but appears to be based on the BPH's decision that Guzman would not be considered for parole
21 again for three years and on his assertion that he now has served more time than the "statutory
22 maximum of the standard range for his offense" under the matrix.  Id.  The claim will be
23 dismissed because the Sixth Amendment right to jury trial was not implicated, let alone violated,
24 by anything the BPH did in considering Guzman's case.

25        Guzman relies on a recent line of Supreme Court cases that started with Apprendi v. New
26 Jersey, 530 U.S. 466 (2000).  The rule from that line of cases is that, "under the Sixth
27 Amendment, any fact that exposes a defendant to a greater potential sentence [than the statutory
28 maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not

2

merely by a preponderance of the evidence." Cunningham v. California, 127 S. Ct. 856, 863-64 (2007). The relevant statutory maximum "'is not the maximum sentence a judge may impose after finding additional fact, but the maximum he may impose without any additional findings." Id. at 860 (quoting Blakely v. Washington, 542 U.S. 296 303-04 (2004)).

Guzman's claim runs into the insurmountable hurdle that the statutory maximum for his crime is life imprisonment. The maximum sentence allowed under California law following a fact-finder's guilty verdict on the second degree murder charge is life imprisonment.[1] See Cal. Penal Code § 190. No additional facts need to be found beyond those which were found by the trier of fact in his 1990 trial in order for Guzman to be kept in prison for the rest of his life. Nothing the BPH did has caused Guzman's sentence to extend beyond the life maximum to which he was sentenced and for which he may be imprisoned based on the second degree murder conviction. He has no right to jury trial in connection with any decision whether to release him before the expiration of his life maximum term. That the Apprendi line of cases does not apply is evidenced by the fact that an indeterminate sentencing scheme is one of the proposed solutions to the jury trial problems caused by determinate sentencing schemes the Court has invalidated. See, e.g., Blakely, 542 U.S. at 305 (citing with approval Williams v. New York, 337 U.S. 241 (1986) (judge's consultation of facts outside the trial record to decide whether to sentence defendant to death did not violate the jury trial right because the indeterminate sentencing scheme allowed the judge to sentence the defendant to death or imprisonment)); see also id. at 332 (Breyer, J., dissenting) (noting that one of the alternatives to Guidelines-type sentencing scheme is indeterminate sentencing, such as California's former system). In Blakely, the Court explained that indeterminate sentencing that gives a judge greater judicial power to set sentence does not infringe on the province of the jury: "It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to the lawful imposition of the penalty. Of course, indeterminate schemes involve judicial factfinding, in that

---

[1]Guzman indicates he was convicted following a court trial rather than a jury trial. The Apprendi analysis thus would be based on the maximum term he could receive based on the judge's decision as the trier of fact, and that is a life maximum.

1    a judge (like a parole board) may implicitly rule on those facts he deems important to the

2    exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has

3    a legal right to a lesser sentence–and that makes all the difference insofar as judicial

4    impingement upon the traditional role of the jury is concerned." Blakely, 542 U.S. at 308-09.

5        Guzman's statement that there is a statutory maximum under the matrix is simply a

6    misunderstanding of the law: there is no statutory maximum term of years for a person convicted

7    of second degree murder. California does have a regulation with a matrix of suggested base

8    terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second

9    degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of

10   19, 20, or 21 years, depending on some of the facts of the crime. However, that matrix is not

11   consulted to set a term unless and until the BPH has found the inmate suitable for parole. See 15

12   Cal. Code Regs. § § 2401, 2402, 2403(a); In re Dannenberg, 34 Cal. 4th 1061, 1070-71, 1078

13   (Cal.), cert. denied, 126 S. Ct. 92 (2005). The BPH has not yet had the occasion to consult the

14   matrix to determine an appropriate term for Guzman because it has not yet found him suitable

15   for parole. The matrix does not set a statutory maximum for the length of imprisonment for a

16   second degree murderer; California Penal Code § 190 does. And § 190 sets the statutory

17   maximum for such an inmate at life imprisonment. No jury trial must be provided to keep the

18   life inmate in prison beyond highest number of years in the matrix. The Sixth Amendment right

19   to jury trial has no applicability to the parole determination for California's murderers who are

20   serving indeterminate life sentences. The claim is dismissed without leave to amend.

21

22        2.    Three-Year Denial Claim

23        Guzman alleges that the BPH failed to comply with a state court decision prohibiting

24   multiple year denials after earlier one-year denials. At his 2005 hearing, the BPH told him he

25   would not be considered again for three years, even though at his 2003 hearing, he had received

26   only a one-year parole denial. He contends that this was done as a ploy to eliminate hearing

27   backlogs and violated his Fourteenth Amendment right to equal protection.

28        Guzman's claim that the BPH failed to comply with a state court order must be dismissed.

4

1   A state prisoner can only seek the writ of habeas corpus on the ground that he is in custody in
2   violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). In
3   other words, a writ of habeas corpus is available under § 2254(a) "only on the basis of some
4   transgression of federal law binding on the state courts." Middleton v. Cupp, 768 F.2d 1083,
5   1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)), cert. denied, 478 U.S.
6   1021 (1986). It is unavailable for violations of state law or for alleged error in the interpretation
7   or application of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Engle, 456 U.S. at
8   119.    Even if the 3-year denial violated a state court decision, federal habeas relief is not
9   available for that violation alone.

10      The petition also alleges that the 3-year denial violated Guzman's equal protection rights,
11  but this court does not understand how the facts alleged suggest an equal protection violation.
12  The Fourteenth Amendment's Equal Protection Clause provides that no State shall deny to any
13  person "the equal protection of the laws." U.S. Const. amend. XIV.  The Equal Protection
14  Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v.
15  Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  To prevail on an equal protection claim,
16  petitioner must initially show that he was treated differently from other similarly situated
17  persons. City of Cleburne, 473 U.S. at 439; Fraley v. United States Bureau of Prisons, 1 F.3d
18  924, 926 (9th Cir. 1993) (per curiam). Guzman has not done so. His conclusory allegation that
19  the 3-year denial was done to clear a backlog would not necessarily show an equal protection
20  violation; if the inmate is not expected to have made enough progress within a year or two years,
21  a three year denial would be appropriate. The partial transcript of the 2003 hearing attached to
22  the petition shows that Guzman was told in 2003 to "come back with a GED next time" and "you
23  do need to give some more thought as to what caused you to commit this crime," and "at some
24  point you're going to have to – need to try to make amends and come to grips or come to terms
25  with what you did."    11/4/03 RT 48.  Despite the guidance at the 2003 proceeding, as of two
26  years later he apparently had not obtained the GED degree or developed any insight into his
27  criminal conduct or alcohol problem.  The transcript of the 2005 hearing attached to Guzman's
28  petition contains the BPH's explanation why he received a three-year denial: he had "displayed

5

1  absolutely no insight into this behavior or the impact of his crime," apparently had "outright lied

2  to his wife" about the reason for the crime (which apparently was to hurt a woman who had

3  rebuffed his romantic advances by killing her father and threatening to kill another relatives),

4  had programmed in a limited manner and had not yet obtained his GED, and had not sufficiently

5  participated in beneficial self-help programs.  9/13/05 RT 51-52; see also 53-54 (commissioner

6  explaining that a multiple year denial was given because Guzman had so much work to do on

7  an alcohol problem that he had tried to  minimize).

8      The second claim will be dismissed because the alleged failure to comply with the state

9  court's decision is not a proper basis for federal habeas relief and because the petition does not

10  state a claim for an equal protection violation.  Leave to amend will be permitted so that Guzman

11  may attempt to allege facts showing an equal protection violation.

12

13                                   **CONCLUSION**

14      For the foregoing reasons, the petition is dismissed with leave to amend.  Guzman must

15  file an amended petition no later than **September 7, 2007.**  Guzman is cautioned that any claim

16  he presents here must first have been presented to the California Supreme Court in order to

17  exhaust his state court remedies.  See 28 U.S.C. § 2254(b), (c).  Guzman also is cautioned that

18  this action concerns only the September 13, 2005 denial of parole and not any other parole denial

19  decision.  Failure to file an amended petition by the deadline will result in the dismissal of this

20  action.

21      The in forma pauperis application is DENIED because Guzman has sufficient funds in

22  his inmate account to pay the filing fee.  (Docket # 2.)  Guzman must pay the $5.00 filing fee

23  no later than **September 7, 2007.**  Failure to pay the filing fee by the deadline will result in the

24  dismissal of this action.

25      IT IS SO ORDERED.

26  DATED: July 30, 2007

                                    _____
27                                   SUSAN ILLSTON
                                     United States District Judge
28

                                          6

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JOSE GUZMAN,

          Plaintiff,

   v.

BEN CURRY et al,

          Defendant.

_____/

Case Number: CV07-03051 SI

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 1, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jose Guzman E-53800
Corr Training Facility
FW-205L
P.O. Box 689
Soledad, CA 93960

Dated: August 1, 2007

Richard W. Wieking, Clerk
By: R.B. Espinosa, Deputy Clerk

EXHIBIT    1

page 1 of

Guzman, Joe

E-5380

**DEPT.** 123

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: APRIL 6, 1990

HONORABLE: CANDACE, COOPER   JUDGE

M FREELAND//77 - 107   Deputy Sheriff

M JUHL

D MORAN   OK'D TO GO S/W NOTED , Deputy Clerk

844 2 4 1990

, Reporter

(Parties and counsel checked if present)

| A980858 | PEOPLE OF THE STATE OF CALIFORNIA | Counsel for Plaintiff X | IRA A REINER , DISTRICT ATTY.   BY |
| | VS | | P TURNER   DEPUTY |
| X | GUZMAN, JOSE | Counsel for Defendant X | X PUBLIC DEFENDER X X X X X X X G CHALETT PVT |
| | X295061 | | DEPUTY X X X X X |

NATURE OF PROCEEDINGS  PROBATION AND SENTENCE   (Boxes checked if order applicable)

pay restitution fine in sum of $100.00 pursuant to section 13967(a) government code payable to restitution fund. Court advises defendant of his appeal /RIGHTS.

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having..been......................duly......found.................................................................
guilty in this court of the crime of  MURDER(187(a) PC),as charged in the information,
which the COURT  found to be MURDER in the second degree; court
finds the allegation pursuant to section 12022.5 pc  to be true;
COURT further alleged that in the commission and attempted commission of
the above offense, the said defendant, personally used a firearm within the
meaning of Penal code sections 1203.06(a)(1) AND 12022.5 and also causing
the above offense to become a serious felony pursuant to penal code section
1192.7(c)(8)

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
State Prison. FOR THE TERM OF 15 years to LIFE,plus 2 years PURSUANT TO
section 12022.5 PC for the total of 17 years to LIFE.

☒ Defendant is given credit for.....699.....................days in custody (includes__233_days good time/work time).

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles
and delivered by him into the custody of the Director of Corrections at the California State Institution

☒ for Men at Chino, California

☐ for Women at Frontera, California

☐ ...............................................................................

☐ Remaining count(s) dismissed in interests of justice.

☐ Bail exonerated.

ENTERED

4-6-90

FRANK S ZOLIN
COUNTY CLERK

AND CLERK OF THE
SUPERIOR COURT

**JUDGMENT**   1h

2   76J805A (REV. 7-82) 7-82
C-109

EXHIBIT     2

JL. GEMENT CLERK

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

### PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.   1

| DEFENDANT'S NAME(S) | | | | COURT | JUDGE | COURT CASE NO. |
|---|---|---|---|---|---|---|
| JOSE GUZMAN<br>T/N:   JOSE DEJESUS GUZMAN | | | | 123 | COOPER | A980858 |

| ADDRESS (PRESENT/RELEASE) | | | | HEARING DATE | DEFENSE ATTY | PROSECUTOR |
|---|---|---|---|---|---|---|
| 10001½ EST 29TH STREET<br>LOS ANGELES, CA 90011 | | | | 4-6-90 | CHALEFF | TURNER |

| BIRTHDATE<br>9-28-30 | AGE<br>59 | SEX<br>MALE | RACE<br>HISPANIC | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| CITIZENSHIP STATUS<br>UNDOCUMENTED | | DRIVER'S LICENSE/EXP. DATE<br>NONE | | MC AFEE | CAI | 974-9035 |

| PROBATION NO<br>X- 295061 | CII NO.<br>A08975798 | BOOKING NO.<br>1177107 | TYPE REPORT |
|---|---|---|---|
| DAYS IN JAIL THIS CASE | | CUSTODY STATUS/RELEASE DATE | __X__ Probation and sentence |
| ☒ ESTIMATED   ☐ VERIFIED<br>466 | | L.A. COUNTY JAIL | _____ Pre-Conviction (131.3 CCP)<br>_____ Post sentence<br>_____ Diversion (Specify) _____ |

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES) *2nd Degree*

COUNT 1:    187 PC (MURDER), WITH USE OF FIREARM PER SECTION 12022.5 PC AND
1203.06(A)(1) PC

COUNTS 2,3:    245(A)(1) PC (ASSAULT WITH GREAT BODILY INJURY AND WITH DEADLY
WEAPON), USE OF FIREARM 12022.5 PC AND 1203.06(A)(1) PC

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES) *2nd Degree*

COUNT 1 - 187 PC (MURDER), WITH USE 12022.5 PC

COUNTS 2 AND 3:    245(A)(1) PC (ASSAULT WITH GREAT BODILY INJURY AND WITH
DEADLY WEAPON) - USE OF FIREARM 12022.5 PC

| CONVICTED BY<br>Court Trial | DATE OF CONVICTION/REFERRAL<br>3/20/90 | COUNT(S) CONTINUED TO P & S FOR DISPOSITION<br>1203.06(A)(1) ALLEGATIONS  ALL THREE COUNTS |
|---|---|---|
| PROPOSED PLEA AGREEMENT<br>NONE | | SOURCES OF INFORMATION<br>D.A. FILE |
| DATE(S) OF OFFENSE<br>12-25-88 | | TIME(S)<br>11:00 PM. |

| DEFENDANT:  ☒ N/A | ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____ | HOLD/WARRANTS. |
|---|---|---|
| (SEE PRIOR<br>RECORD<br>SECTION) | ☐ ON PROBATION   ☐ PENDING PROBATION VIOLATION   ☐ PENDING NEW CASE<br>☐ ON PAROLE-REMAINING TIME _____ | ☐ YES ☒ NO |

| RECOMMENDATION: | | | | |
|---|---|---|---|---|
| ☐ PROBATION | ☒ DENIAL<br>☐ COUNTY JAIL<br>☒☒ STATE PRISON | ☐ DIAGNOSTIC STUDY<br>☐ 707.2 WIC<br>☐ 1203.03 PC | ☐ CYA | ☐ OTHER _____ |

| PRESENT OFFENSE: (CONTINUED) | SOURCES OF INFORMATION (this page) D.A. FILE |
|---|---|

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 12-25-88 | 11:30 | JOSE GUZMAN | 187 PC | 3221 S. BROADWAY LOS ANGELES, CA | LAPD |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| NONE | | |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:

MARCELLA GARCIA, THE VICTIM'S DAUGHTER, HAD BEEN LIVING WITH THE DEFENDANT'S SON, FELIPE GUZMAN, AND HAD A CHILD BY HIM. THEY SEPARATED IN 1986 BECAUSE OF PHYSICAL ABUSE BY THE DEFENDANT'S SON. SHE HAD BEEN PLANNING TO MARRY ANOTHER MAN PRIOR TO THE PRESENT OFFENSE.

THE DEFENDANT'S WIFE PLANNED TO TAKE MARCELLA'S CHILD BACK TO SEE THE CHILD'S FATHER WHO NOW HAD BEEN LIVING IN MEXICO, SOMETIME PRIOR TO CHRISTMAS OF 1988. THE DEFENDANT'S WIFE ASKED MARCELLA GARCIA TO STAY WITH THE DEFENDANT AND TAKE CARE OF HIM.

MARCELLA GARCIA THEN STAYED WITH THE DEFENDANT AND THE DEFENDANT, DURING THE TIME SHE WAS STAYING WITH HIM, TOLD HER THAT HE LOVED HER AND WANTED HER TO LIVE WITH HIM. ON CHRISTMAS EVE, DECEMBER 24, 1988, THE DEFENDANT AND MARCELLA WENT OVER TO HER PARENT'S HOME. AT THAT TIME, THE DEFENDANT THEN TOLD HER THAT HE WAS IN LOVE WITH HER.

-2- (GUZMAN)

1          THE DEFENDANT WAS TOLD  BY MARCELLA GARCIA THAT

2    SHE WAS PLANNING TO MARRY ANOTHER MAN AND PERHAPS OTHER

3    FAMILY MEMBERS TOLD HIM AS WELL.  THE DEFENDANT THEN LEFT

4    THE HOUSE.  APPROXIMATELY 15 MINUTES LATER, HE RETURNED AND

5    PARKED HIS VAN IN FRONT OF THE VICTIM'S HOUSE.  THE DEFENDANT

6    BEGAN BLOWING THE HORN OF HIS VAN AND MARCELLA'S SISTER,

7    BERTHA, WENT OUT TO SEE WHAT THE DEFENDANT WANTED.  THE DEFENDANT

8    THEN TOLD HER TO TELL MARCELLA THAT THIS IS HER LAST CHANCE

9    TO GO WITH HIM.  BERTHA WENT IN THE HOUSE AND TOLD THE FAMILY

10    WHAT THE SUSPECT WANTED.  THE VICTIM, THE FATHER OF MARCELLA,

11    WALKED OUT TO THE VAN TO TALK TO THE DEFENDANT.  AS HE APPROACHED

12    THE DRIVER'S SIDE OF THE VAN, THE DEFENDANT OPENED THE DOOR

13    AND SHOT THE VICTIM TWICE WITH A 30-CALIBER CARBINE RIFLE.

14    THE VICTIM FELL TO THE GROUND IN FRONT OF THE DEFENDANT'S

15    VAN.  THE DEFENDANT EXITED THE VAN WITH THE RIFLE AND A WITNESS,

16    JOHNNY CHACON, WHO HEARD THE SHOT, WRESTLED THE RIFLE FROM

17    HIM.  THE DEFENDANT THEN WENT INTO THE VICTIM'S HOUSE AND

18    WAITED FOR THE POLICE TO ARRIVE.

19          WITNESS JOHNNY CHACON AND THE VICTIM'S SON TOOK

20    THE VICTIM TO THE FIRE STATION AND THERE HE WAS TRANSPORTED

21    BY RESCUE AMBULANCE TO THE CALIFORNIA HOSPITAL WHERE A DOCTOR

22    PRONOUNCED HIM DEAD AT 11:22, CHRISTMAS DAY.

23          POLICE CAME TO THE HOUSE.  A DETECTIVE ASKED

-3- (GUZMAN)

1    IF THE DEFENDANT WAS THE PERSON WHO DID IT.  AT THIS TIME,

2    THE DEFENDANT RAISED HIS LEFT HAND AND SAID, "I DID IT."

3    "I DID IT."

4            AT WITNESS, VICTORIA AYALA, STATES THAT AFTER

5    HER BROTHER, JOHNNY CHACON, TOOK THE GUN AWAY FROM THE DEFENDANT,

6    HER FATHER ASKED THE DEFENDANT WHY HE SHOT THE VICTIM.  AT

7    THIS TIME, THE DEFENDANT STATED THAT HE WANTED TO MAKE THEM

8    SUFFER LIKE HE WAS SUFFERING.  WITNESSES FURTHER RELATED

9    THAT THE DEFENDANT HAD BEEN CONSUMING ALCOHOLIC BEVERAGES

10   AND THEY BELIEVED THAT HE WAS DRUNK.

11            COUNT TWO:  AFTER THE DEFENDANT SHOT THE VICTIM

12   IN COUNT ONE, HE POINTED THE RIFLE AT THE VICTIMS AND STATED,

13   "I AM GOING TO KILL YOU, BERTHA."  BERTHA GARCIA THEN RAN INSIDE

14   THE HOUSE AND THEN OUT BACK, BELIEVING THAT DEFENDANT WAS GOING

15   TO CARRY OUT HIS THREAT.

16            COUNT THREE:  PABLO GARCIA HEARD THREE SHOTS AND

17   OBSERVED THE DEFENDANT STANDING NEXT TO HIS VAN.  THE DEFENDANT

18   POINTED THE RIFLE AT PABLO GARCIA.

19

20

21

22

23

-4- (GUZMAN)

| VICTIM: | SOURCES OF INFORMATION (this page) |
|---|---|
| | D.A. FILE AND VICTIM'S DAUGHTER |

| NAME | COUNT(S) |
|---|---|
| PASQUAL GARCIA | 1, 2, 3 |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

DEATH

INSURANCE COVERAGE

NONE

| LOSS: ☒ YES ☐ NO | ESTIMATED LOSS SEE BELOW | RESTITUTION ALREADY MADE NONE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK    ☐ YES  ☒ NO |
|---|---|---|---|

**VICTIM STATEMENT:**

MARIA ELENA GARCIA, THE VICTIM'S DAUGHTER-IN-LAW

RELATES THAT THE ENTIRE FAMILY HAS NOW MOVED TO SAN DIEGO.    SHE

RELATES THAT HER FATHER-IN-LAW WAS THE FATHER OF NINE CHILDREN.    AT

THE TIME OF HIS DEATH, SIX CHILDREN WERE UNDER THE AGE OF 18, AND

FIVE CHILDREN STILL ARE.

SHE RELATES THAT HER FATHER-IN-LAW WAS AN EXTREMELY

HARD-WORKING PERSON WHO WORKED 12 OR 13 HOURS PER DAY AND THE

FAMILY HAS NOT YET RECOVERED FROM HIS DEATH.    SHE FURTHER STATES

THAT HER MOTHER-IN-LAW HAS NOT BEEN THE SAME SINCE THE DEATH

OF HER HUSBAND AND THERE IS A GREAT DEAL  OF DISTRESS IN THE

FAMILY.    SOME OF THE CHILDREN ARE NOW STARTING TO GET INTO

TROUBLE AND/OR HAVING SCHOOL PROBLEMS.

MARIA ELENA GARCIA RELATES THAT MARCELLA, THE

OBJECT OF THE DEFENDANT'S AFFECTION, HAS TOLD HER THAT SHE WAS

AFRAID OF THE DEFENDANT.    MS. GARCIA BELIEVES THAT THE (CONT.)

| RESTITUTION | TOTAL NUMBER OF VICTIMS 1 | ESTIMATED LOSS TO ALL VICTIMS LIFE | VICTIM(S) NOTIFIED OF P&S HEARING ☒ YES    ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION:  ☐ YES  ☒ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-5- (GUZMAN)    _____ VICTIM LIST CONTINUES NEXT PAGE

1    DEFENDANT SHOULD RECEIVE THE MAXIMUM AMOUNT OF TIME IN CUSTODY.

2

3

4

5

6

7

8    VICTIM NOTIFIED PURSUANT TO SECTION 1192.03(B) PENAL CODE

9    AND 679.03 PENAL CODE.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ADDITIONAL VICTIMS:

SOURCES OF INFORMATION (this page)

D.A. FILE

| NAME | COUNT(S) |
|------|----------|
| BERTHA GARCIA | 2 |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

NONE

INSURANCE COVERAGE

NONE

| LOSS: ☐ YES ☒ NO | ESTIMATED LOSS NONE | RESTITUTION ALREADY MADE NONE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK   ☐ YES   ☒ NO |
|---|---|---|---|

VICTIM STATEMENT:          MARIA ELENA GARCIA RELATES THAT THE VICTIM IS STILL

AFRAID OF THE DEFENDANT AND WOULD LIKE TO SEE HIM SENT TO PRISON.

VICTIM NOTIFIED PURSUANT TO SECTION 1192.03(B) PC AND 679.03 PC.

-6A- (GUZMAN)

76P725B—Prob. 19SC (Rev. 6/85)

ADDITIONAL VICTIMS:

SOURCES OF INFORMATION (this page)

D.A. FILE

| NAME | COUNT(S) |
|------|----------|
| PABLO GARCIA | 3 |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

NONE

INSURANCE COVERAGE

NONE

| LOSS: ☐ YES ☒ NO | ESTIMATED LOSS NONE | RESTITUTION ALREADY MADE NONE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK ☐ YES ☒ NO |
|---|---|---|---|

VICTIM STATEMENT:        MARIA ELENA GARCIA RELATES THAT THE VICTIM IS STILL

AFRAID OF THE DEFENDANT AND WOULD LIKE TO SEE HIM SENT TO PRISON.

VICTIM NOTIFIED PURSUANT TO SECTION 1192.03(B) PC AND 679.03 PC.

-6B-  (GUZMAN)

76P725B—Prob. 195C (Rev. 6/85)

1  PRIOR RECORD:

SOURCES OF INFORMATION (this page)
CLETS (12-21-90); PROBATION DEPT.
RECORDS AND DEFENDANT'S STATEMENT

2

3  AKA'S:  NONE KNOWN.

4                    JUVENILE HISTORY:

5                    INFORMATION IS NOT AVAILABLE THROUGH PROBATION

6     DEPARTMENT INQUIRY FIVE YEARS AFTER JUVENILE PROBATION ACTIVITY

7     IS TERMINATED AND THE DEFENDANT ADMITS NO RECORD.

8                    ADULT HISTORY:

9   7-30-70          U.S. IMMIGRATION SERVICE/SAN YSIDRO, CA – CHARGE 1,
                     ATTEMPTED ENTRY WITH DOCUMENTATION OF ANOTHER
10                   ALIEN – ATTEMPTED ENTRY WITH DOCUMENTATION OF
                     ANOTHER ALIEN – PROSECUTION DECLARED RETURNED
11                   TO MEXICAN IMMIGRATION AUTHORITIES.

12        (THE DEFENDANT ACKNOWLEDGES THAT HE IS AN UNDOCUMENTED
          ALIEN.  HE RELATES THAT HE WAS IN U.S. IMMIGRATION CUSTODY
13        FOR ONE OR TWO DAYS.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29    -7-   · (GUZMAN)

| PERSONAL HISTORY: | SOURCES OF INFORMATION (this page) |
| | DEFENDANT |

**SUBSTANCE ABUSE:**

_____ No record, indication, or admission of alcohol or controlled substance abuse.

_____ Occasional social or experimental use of _____ acknowledged.

__X__ See below: Indication / admission of significant substance abuse problem.

Referred to Narcotic Evaluator ☐ Yes ☒ No          _____ Narcotic Evaluator's report attached

Additional information

        THE DEFENDANT RELATES THAT HE BEGAN DRINKING

HEAVILY TWO YEARS, JUST PRIOR TO THE PRESENT OFFENSE.    HE RELATES

THAT, DURING DECEMBER, HE WOULD DRINK FIVE ONE-HALF PINTS OF

TEQUELA EVERY DAY.

**PHYSICAL / MENTAL / EMOTIONAL HEALTH:**

__X__ No indication or claim of significant physical/mental/emotional health problem.

_____ See below: Indication / claim of significant physical/mental/emotional health problem.

    -8- (GUZMAN)

| PERSONAL HISTORY: (CONTINUED) | SOURCES OF INFORMATION (this page) DEFENDANT | | | | |
|---|---|---|---|---|---|

| RESIDENCE | TYPE RESIDENCE | LENGTH OF OCCUPANCY | MORTGAGE/RENT | RESIDES WITH/RELATIONSHIP |
|---|---|---|---|---|
| | HOUSE | 8 YEARS | $400 | WIFE AND 6 CHILDREN |
| RESIDENTIAL STABILITY LAST FIVE YEARS | | CAME TO STATE / FROM | | CAME TO COUNTY / FROM |
| GOOD | | MEXICO/1970 | | SAME |

Additional information

DEFENDANT RELATES THAT HE IS AN UNDOCUMENTED ALIEN WHO HAS BEEN DEPORTED ON TWO OCCASIONS.  A LETTER HAS BEEN SENT TO THE DEPARTMENT OF IMMIGRATION, INFORMING THEM OF THIS OFFENSE.

| MARRIAGE / PARENTHOOD | MARITAL STATUS | NAME OF SPOUSE / PRESENT COHABITANT |
|---|---|---|
| | MARRIED | SOPHIA HERNANDEZ |
| LENGTH OF UNION | NO. OF CHILDREN THIS UNION | SUPPORTED BY |
| 1960 TO PRESENT | 6 | DEFENDANT AND WIFE |
| NO. PRIOR MARRIAGES / COHABITATIONS | NO. OF CHILDREN THESE UNIONS | SUPPORTED BY |
| NONE | N/A | N/A |
| NO. OF OTHER CHILDREN | SUPPORTED BY | |
| NONE | N/A | |

Additional information

DEFENDANT RELATES THAT ONLY ONE OF HIS CHILDREN IS 16 YEARS OF AGE.  ALL THE OTHERS ARE GROWN.

FORMAL EDUCATION:
DEFENDANT RELATES THAT HE ONLY ATTENDED ONE YEAR OF SCHOOL IN MEXICO AND THIS IS ON THE KINDERGARTEN LEVEL.

**PERSONAL HISTORY:**
**(CONTINUED)**

SOURCES OF INFORMATION (this page)

DEFENDANT

| EMPLOYMENT STATUS | ☐ EMPLOYED | REFERRED TO WORK FURLOUGH | EMPLOYER AWARE OF PRESENT OFFENSE |
|---|---|---|---|
| | ☒☒ UNEMPLOYED | ☐ YES ☒ NO | ☒ N/A    ☐ YES    ☐ NO |

| PRESENT/LAST EMPLOYER / ADDRESS / PHONE | OCCUPATION | PERIOD OF EMPLOYMENT | GROSS MONTHLY WAGE |
|---|---|---|---|
| TACOS ELUNCIO NUMERO DOS SOUTH CENTRAL AND 48TH STREET LOS ANGELES, CA | COOK | 4-88 TO 12-88 | $1,000 |
| | EMPLOYMENT STABILITY LAST 5 YEARS | TYPES OF PREVIOUS EMPLOYMENT | |
| ☐ VERIFIED    ☒ UNVERIFIED | FAIR | SEE BELOW | |

Additional information

THE DEFENDANT RELATES THAT FROM 1971 TO 1977

HE WORKED FOR THEODORE MANUFACTURING COMPANY IN GARDENA AS A

LABORER, EARNING APPROXIMATELY $100 A MONTH.  FROM 1985, HE

WORKED FOR THE GOLDEN EAGLE CONSTRUCTION COMPANY AS A LABORER

IN SANTA CLARITA.  ALSO FROM 1985 TO 1988, HE WAS A (CONT. NEXT PG.)

| FINANCIAL STATUS | INCOME STABILITY GOOD | NET MONTHLY INCOME $1,600 (APPROXIMATE) | |
|---|---|---|---|
| PRIMARY INCOME SOURCE ($1,000) EMPLOYMENT | SECONDARY INCOME SOURCE(S) ($600) WIFE'S EMPLOYMENT | EST. TOTAL ASSETS NONE | EST. TOTAL LIABILITIES NONE |

MAJOR ASSETS / ESTIMATED VALUE

NONE

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

NONE

Additional information

DEFENDANT RELATES THAT AT THE TIME OF HIS ARREST,

HIS  WIFE HAD BEEN LAID OFF FROM HER JOB WHERE SHE HAD BEEN

EARNING $600 A MONTH. HE DOES NOT KNOW HOW THE FAMILY IS BEING

SUPPORTED AT THIS TIME.

GANG ACTIVITY    ☐ YES    ☒ NO          Name of Gang _____

-10- (GUZMAN)

1    PERSONAL HISTORY (CONTINUED):

2                EMPLOYMENT STATUS (CONTINUED):

3    STREET VENDOR, SELLING TOSTADOS.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

INTERESTED PARTIES:

DETECTIVE REYNA, 485-5275, HAS BEEN CONTACTED BY TELEPHONE. HE BELIEVES THAT THE DEFENDANT HAD BEEN COOPERATIVE DURING THE ARREST PROCEDURES AND, BECAUSE OF THE CIRCUMSTANCES OF THE OFFENSE, THE DEFENDANT SHOULD RECEIVE THE LOW-BASE TERM IN STATE PRISON.

DETECTIVE KALISH, LOS ANGELES POLICE DEPARTMENT, HAS BEEN CONTACTED AT 485-2504. DETECTIVE KALISH RELATES THAT THE DEFENDANT DELIBERATELY COMMITTED THE ACT THAT CAUSED THE VICTIM'S DEATH. HE LEFT THE HOME, SECURED A RIFLE, AND THEN CAME BACK TO THE VICTIM'S RESIDENCE AND SHOT HIM. HE DOES NOT BELIEVE THAT THE DEFENDANT SHOULD RECEIVE ANY LENIENT TREATMENT.

DEFENDANT'S STATEMENT:

THE DEFENDANT RELATES THAT HE DOES NOT KNOW WHY HE KILLED THE VICTIM. HE STATES THAT HE HAD DRUNK A LOT OF TEQUILA AND DOES NOT REMEMBER ANYTHING. HE DOES ACKNOWLEDGE THAT HE HAD BEEN IN LOVE WITH THE VICTIM'S DAUGHTER AND HAD ASKED HER TO MARRY HIM. HE FURTHER RELATES THAT HE HAD HAD SEX WITH THE VICTIM'S DAUGHTER ON ONE OCCASION. HE DEEPLY REGRETS HIS CONDUCT AND IS SORRY FOR HIS ACTION.

EVALUATION:

THE PRESENT OFFENSE APPARENTLY GREW OUT OF

-12- (GUZMAN)

76C692G – PROB. 5A

THE DEFENDANT'S INFATUATION WITH THE VICTIM'S DAUGHTER.  HE

HAD MADE ADVANCES TO HER REGARDING HIS AFFECTIONS AND HAD BEEN

REBUFFED.  THERE IS NO INDICATION AT ALL THAT THERE WAS ANY

SORT OF BAD FEELINGS BETWEEN THE FAMILIES OR BETWEEN THE DEFENDANT

AND THE VICTIM.  THE CAUSE OF THE PRESENT MATTER SEEMS TO HAVE

BEEN THE DEFENDANT'S EXTREMELY INAPPROPRIATE AND DEADLY REACTION

TO THE REJECTION OF THE VICTIM'S DAUGHTER.

THE ABOVE DESCRIPTION OF THE CIRCUMSTANCES

OF THE OFFENSE DOES NOT AT ALL DO JUSTICE TO THE GRIEF AND

TURMOIL THAT THE DEFENDANT HAS CAUSED.  HE HAS COMPLETELY

DESTROYED A FAMILY BY TAKING THE FATHER OF NINE CHILDREN FROM

THEM.  FIVE OF THE CHILDREN ARE IN DIRE NEED OF HIS SUPPORT

AND GUIDANCE, BUT, OF COURSE, THEY CANNOT HAVE IT BECAUSE HE

IS DEAD.  THE DEFENDANT, EVEN THOUGH HE HAS EXPRESSED SORROW

FOR HIS ACTIONS, SEEMS TO HAVE GIVEN LITTLE THOUGHT TO THE

DISASTER THAT HE HAD BROUGHT ABOUT FOR THE OTHER FAMILY.  NO

AMOUNT OF JAIL TIME CAN POSSIBLY MAKE UP TO THE VICTIM'S FAMILY

FOR THE DISTRESS THAT THE DEFENDANT HAS CAUSED.

IT IS HOWEVER SUGGESTED THAT THE DEFENDANT

SHOULD RECEIVE THE MAXIMUM AMOUNT OF TIME IN PRISON AS A PUNISHMENT.

HE APPARENTLY HAD AT LEAST 15 MINUTES TO THINK ABOUT HIS ACTION.

HE STILL, HOWEVER, WAS ABLE TO GET INTO HIS VAN, DRIVE IT TO

THE PLACE WHERE A WEAPON WAS KEPT, BRING THE WEAPON BACK, AND

-13- (GUZMAN)

76C692G — PROB. 5A

1  THEN IN A RATHER COLD-BLOODED AND CALCULATING MANNER, KILL

2  THE VICTIM.   THIS TYPE OF CONDUCT DOES NOT DESERVE ANY LENIENT

3  TREATMENT AND THE DEFENDANT SHOULD NOT RECEIVE ANY CREDIT BECAUSE

4  OF HIS AGE.   IT IS WELL TO NOTE THAT HE DOES NOT HAVE ANY

5  PREVIOUS CRIMINAL HISTORY, BUT THIS IN NO WAY MITIGATES THE

6  FACT THAT HE COMMITTED AN EXTREMELY COLD-BLOODED AND CALCULATING

7  ACT THAT HAS DEPRIVED A FAMILY OF PERHAPS ITS MOST IMPORTANT

8  MEMBER.

9                      SENTENCING CONSIDERATIONS:

10                     PURSUANT TO SECTION 1203.06(A)(1) OF THE PENAL

11  CODE, THERE IS A QUESTION OF THE LEGAL ELIGIBILITY OF THE

12  DEFENDANT FOR PROBATION, WHICH THE COURT MUST DETERMINE.

13                 CIRCUMSTANCES IN AGGRAVATION:

14          1.   THE CIRCUMSTANCES OF THE OFFENSE INDICATE
15               PREMEDITATION, IN THAT THE DEFENDANT LEFT
                 THE VICTIM'S HOME IN HIS VAN, SECURED A
16               WEAPON, RETURNED TO THE VICTIM'S HOME IN
                 HIS VAN, AND THEN SHOT THE VICTIM.

17          2.   THE VICTIM WAS PARTICULARLY VULNERABLE
18               IN THAT HE CAME TOWARDS THE DEFENDANT'S
                 VAN WITHOUT KNOWING HIS DEADLY INTENT.
19               THE DEFENDANT WAS SITTING IN THE VAN AND
                 HE SHOT THE VICTIM.

20

21                 CIRCUMSTANCES IN MITIGATION:

22                 NONE.

23                 IT IS RECOMMENDED THAT THE COURT USE THE

    -14- (GUZMAN)

1    ENHANCEMENT PER SECTION 12022.5 PENAL CODE AND IMPOSE THE

2    REQUISITE PRISON SENTENCE.

3    RECOMMENDATION:

4                 IT IS RECOMMENDED THAT PROBATION BE DENIED

5    AND THAT DEFENDANT BE SENTENCED TO STATE PRISON WITH

6    PRE-IMPRISONMENT CREDIT OF 466 DAYS; THAT THE COURT ORDER THE

7    DEFENDANT TO PAY A RESTITUTION FINE OF $100 AS PROVIDED BY

8    SUBDIVISION (A) OF SECTION 13967 OF THE GOVERNMENT CODE,

76C692G - PROB. 5A

1   THE TOTAL AMOUNT TO INCLUDE A SERVICE CHARGE AS PROVIDED BY

2   SUBDIVISION (D) OF SECTION 13967 OF THE GOVERNMENT CODE.

3   RESPECTFULLY SUBMITTED,

4   BARRY J. NIDORF
    PROBATION OFFICER
5

6

7   BY_____
    JAMES A. MC AFEE, DEPUTY
8   CENTRAL ADULT INVESTIGATIONS
    (213) 974-9035

9   READ AND APPROVED:                    I HAVE READ AND CONSIDERED
                                          THE FOREGOING REPORT OF
10                                        THE   PROBATION OFFICER.

11  _____
    FRANK COOKE, SDPO
12

13  (SUBMITTED 3-30-90)                   _____
    (TYPED 3-1-90)                        JUDGE OF THE SUPERIOR COURT
14  JAM:LO (6)

15              IF PROBATION IS GRANTED, IT IS RECOMMENDED

16  THAT THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF

17  PROBATION SERVICES PURSUANT TO SECTION 1203.1B PENAL CODE.

18  COST OF PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT -

19  $412.00.   COST OF SUPERVISION - $28.00 PER MONTH.

20

21

22

23

    -16- (GUZMAN)

EXHIBIT    3

EGAL STATUS SUMMARY   TYPE-   D       CTF-C    ** DISCREPANT **  11/09/98 21:39
```
CDC NUMBER  |  NAME                            |ETHNIC|      BIRTHDATE
  E53800    |  GUZMAN,JOSE                     | MEX  |     09/28/1930
```

TERM STARTS | LIFE TERM STARTS   MIN ELIGIBLE PAROLE DTE |
 04/26/1990 |   04/28/1990              04/27/2000        |
                                                          | PAROLE PERIOD
4SE TERM 15/00 + ENHCMNTS   2/00 = TOT TERM  17/00 TO LIFE  |LIFE

PRE-PRISON + POST SENTENCE CREDITS
CASE     P2900-5 P1203-3 P2900-1 CRC-CRED MH-CRED P4019   P2931 POST-SENT  TOT
-----------------------------------------------------------------------------
4980858    466                                  233                19    718

NOTIFICATION REQUIRED PER PC290.2
NOTIFICATION REQUIRED PER PC3058.6

DOC. HEARING:  ---/----     DEFENSE ATTORNEY: CHALETT, G
INIT. HEARING: 03/1999    INVESTIGATING AGENCY: LOS ANGELES PD

RECV DT/ COUNTY/    CASE   SENTENCE DATE              CREDIT    OFFENSE
  CNT     OFF-CODE  DESCRIPTION                       CODE       DATE
-----------------------------------------------------------------------------
CONTROLLING PRINCIPAL & CONSECUTIVE    (INCLUDES ENHANCEMENTS/OFFENSES):

--CONTROLLING CASE ---
4/26/1990  LA    A980858        4/06/1990
 01 P187 2ND   MURDER 2ND                              32   12/26/1988
               (O)WPN
               P12022.5(A)   01 USE F'ARM               1

ION-CONTROLLING OFFENSES:
4/26/1990  LA    A980858        4/06/1990
 02 P245(A)(1) ASLT W/D WEAPON                          1    12/25/1988
               (O)WPN
 03 P245(A)(1) ASLT W/D WEAPON                          1    12/25/1988
               (O)WPN

RAN                              RULE        D A Y S
YPE   DATE    END DATE LOG NUMBER   NUMBER  ASSESS LOST REST DEAD
-----------------------------------------------------------------------------
EG 04/26/1990          ******BEG BAL*******
  CURRENT PC BALANCE:   457         CURRENT BC BALANCE:  1370

EXHIBIT     4

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                           )
JOSE GUZMAN                 )
_____ )

CDC Number E-53800

**INMATE**
**COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 13, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
D.H. MCBEAN, Deputy Commissioner

OTHERS PRESENT:

JOSE GUZMAN, Inmate
KATERA E. RUTLEDGE, Attorney for Inmate
JACK DELAVIGNE, Deputy District Attorney
JOSE ZAVALA, Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | No | See Review of Hearing |
| | Yes | Transcript Memorandum |

**Marsha Mees, Peters Shorthand Reporting**

ii

## INDEX

Page

Proceedings ......................................... 1

Case Factors ....................................... 9

Pre-Commitment Factors ............................ 15

Post-Commitment Factors ........................... 25

Parole Plans ...................................... 20

Closing Statements ................................ 42

Recess ............................................ 46

Decision .......................................... 47

Adjournment ....................................... 55

Transcriber Certification ......................... 56

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER MCBEAN:** All right.

3     We're on record.

4          · **PRESIDING COMMISSIONER FISHER:** All ·

5     right. Thank you. Good morning, Mr. Guzman.

6     All right. This is going to be a subsequent

7     parole consideration hearing for Jose Guzman,

8     CDC number E-53800. Today's date is 9-13-05 and

9     we're at the Correctional Training Facility at

10    Soledad. The inmate was received on 4-26-90

11    from Los Angeles County. The life term began on

12    4-28-90 and the minimum eligible parole date is

13    4-27-2000. The controlling offense for which

14    the inmate has been committed is second degree

15    murder, case number A980858, count one, Penal

16    Code section 187. In that count there was an

17    additional finding of the use of a firearm,

18    that's Penal Code section 12022.5(a). There

19    were also counts two and three. Both of those

20    counts were assault with a deadly weapon, Penal

21    Code section 245(a)(1). The inmate received a

22    term of 17 years to life. Once again, the

23    minimum parole date is 4-27-2000. Mr. Guzman,

24    we're going to tape record your hearing today.

25    For the transcriber, we're each going to say our

26    first and last name and spell our last name.

27    When I get to you, I need your CDC number. All

2

1   right. All right. I'm going to start with

2   myself and go to my left. Susan Fisher,

3   F-I-S-H-E-R, Commissioner.

4        **DEPUTY COMMISSIONER MCBEAN:** My name's

5   D.H. McBean, M-C-B-E-A-N, Deputy Commissioner.

6        **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Jack

7   Delavigne, D-E-L-A-V-I-G-N-E, Deputy District

8   Attorney, Los Angeles County.

9        **ATTORNEY RUTLEDGE:** Katera E. Rutledge,

10  R-U-T-L-E-D-G-E, attorney for Mr. Guzman.

11       **INMATE GUZMAN:** Jose Guzman, G-U-Z-M-A-N.

12  CDC number E-53800.

13       **PRESIDING COMMISSIONER FISHER:** Thank

14  you.

15       **INTERPRETER ZAVALA:** Jose Zavala,

16  Z-A-V-A-L-A, Spanish interpreter for Mr. Guzman.

17       **PRESIDING COMMISSIONER FISHER:** All

18  right. Thank you. And before we go forward

19  with the ADA information, Mr. Zavala, I'm going

20  to go ahead and swear you in. Do you solemnly

21  swear or affirm that the interpretation that you

22  give at today's hearing will the truth and

23  nothing by the truth?

24       **INTERPRETER ZAVALA:** I do.

25       **PRESIDING COMMISSIONER FISHER:** All

26  right. Thank you. Ms. Rutledge, have you had

27  an opportunity to talk to Mr. Guzman about the

3

1    Americans With Disabilities Act?

2        **ATTORNEY RUTLEDGE:**  Yes.  The one

3    accommodation that I see that he needs is an

4    interpreter, which he has today.

5        **PRESIDING COMMISSIONER FISHER:**  All

6    right.  Thank you.  And I want to note for the

7    record that Mr. Guzman did sign the BPT 1073

8    Form on 8-13-04 and stated that he has no

9    disability.  He does require a Spanish

10   interpreter.  However, we have accommodated.

11   that.  Also, Mr. Guzman, I see that you have

12   glasses on.  Are they for reading?

13       **INMATE GUZMAN THROUGH INTERPRETER:**  Yes,

14   I need them because I lost sight in one of my

15   eyes.

16       **PRESIDING COMMISSIONER FISHER:**  Okay.

17   Did you have an opportunity to review your file

18   before you came to your hearing today?

19       **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

20       **PRESIDING COMMISSIONER FISHER:**  Okay.

21   And did you have your glasses?  Yes?

22       **INMATE GUZMAN THROUGH INTERPRETER:**  Well

23   just these.

24       **PRESIDING COMMISSIONER FISHER:**  Okay.

25   And did you have someone help you review the

26   file who speaks Spanish?

27       **INMATE GUZMAN THROUGH INTERPRETER:**  No.

4

1   Just what I was able to understand.

2        PRESIDING COMMISSIONER FISHER:  Okay.  Do

3   you read English?

4        INMATE GUZMAN THROUGH INTERPRETER:  Very

5   little.

6        PRESIDING COMMISSIONER FISHER:  All

7   right.  Do you feel like you were able to do an

8   adequate review of your file?

9        INMATE GUZMAN THROUGH INTERPRETER:  Well,

10  if there was something abnormal in there, once I

11  found an infraction that wasn't mine.

12       PRESIDING COMMISSIONER FISHER:  Okay.  So

13  you were able to do that without assistance?

14       INMATE GUZMAN THROUGH INTERPRETER:  I was

15  able to do this time.

16       PRESIDING COMMISSIONER FISHER:  All

17  right.  Okay.  Then you feel comfortable that

18  your review of your file was adequate enough for

19  you to go forward with your hearing today?

20       INMATE GUZMAN THROUGH INTERPRETER:  Yes.

21       PRESIDING COMMISSIONER FISHER:  All

22  right.  Thank you.  All right.  This hearing is

23  being conducted pursuant to Penal Code sections

24  3041 and 3042 and the rules and regulations of

25  the Board of Prison Terms that govern parole

26  consideration hearings for life inmates.  The

27  purpose of the hearing today, Mr. Guzman, is to

5

1     consider your commitment offense, your prior

2     criminal and social history and your behavior

3     and programming since you've been in prison for

4     this offense. We've had the opportunity to

5     review your files. We're going to give you the

6     opportunity to make any corrections that you

7     need to today. Before we recess to deliberate

8     today, I am going to give you and your attorney,

9     as well as the District Attorney, an opportunity

10    to make a statement about your suitability. I

11    want to remind you you're not required to admit

12    or discuss the offense, but that the Panel

13    accepts the findings of the court to be true.

14    Do you understand that?

15           **INMATE GUZMAN THROUGH INTERPRETER:** Yes.

16           **PRESIDING COMMISSIONER FISHER:** All

17    right. The California Code of Regulations

18    states that regardless of time served the life

19    inmate shall be found unsuitable for and denied

20    parole if in the judgment of the Panel he would

21    pose an unreasonable risk of danger to society

22    if released from prison. You have rights that

23    are related to your hearing. They include the

24    right to a timely notice of the hearing, the

25    right to review your Central File and the right

26    to present relevant documents. Counsel, have

27    your client's rights been met?

6

1           **ATTORNEY RUTLEDGE:**  Yes.

2           **PRESIDING COMMISSIONER FISHER:**  All

3    right.  You also have the right, Mr. Guzman, to

4    an impartial Panel.  Having seen your two Panel

5    members today, do you have any objections to

6    your Panel?

7           **INMATE GUZMAN THROUGH INTERPRETER:**  No.

8           **PRESIDING COMMISSIONER FISHER:**  Counsel,

9    any objections to the Panel?

10          **ATTORNEY RUTLEDGE:**  None.

11          **PRESIDING COMMISSIONER FISHER:**  I'm going

12   to give you a written copy of our decision

13   today, Mr. Guzman.  It's going to be effective

14   within 120 days.  And then a copy of the

15   decision and a copy of the transcript of your

16   hearing is going to be sent to you.  Now they

17   changed the way that you appeal Board decisions

18   last year.  And now all appeals go directly to

19   the courts.  So if you need more information

20   about that, your correctional counselor would

21   have it.  And it should also be in the prison

22   library.  Do you have everything?

23          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  Yes,

24   I have them.  Thank you.

25          **PRESIDING COMMISSIONER FISHER:**  All

26   right.  Thank you.

27          **ATTORNEY RUTLEDGE:**  You're going to use

7

1    Exhibit One?

2            **PRESIDING COMMISSIONER FISHER:** No,

3    Exhibit One is just to mark that for

4    (indiscernible).

5            **ATTORNEY RUTLEDGE:** Okay. All right.

6            **PRESIDING COMMISSIONER FISHER:** Do you

7    have a preference as to which summary we use?

8            **ATTORNEY RUTLEDGE:** Probably the

9    Appellate decision.

10           **PRESIDING COMMISSIONER FISHER:** All

11   right. Is there anything that needs to be

12   submitted?

13           **ATTORNEY RUTLEDGE:** I do have a letter

14   here. Mr. Guzman provided from -- contacted

15   Alcoholics Anonymous looking for information on

16   Mexico AA.

17           **PRESIDING COMMISSIONER FISHER:** Okay.

18   All right. Any preliminary objections?

19           **ATTORNEY RUTLEDGE:** None.

20           **PRESIDING COMMISSIONER FISHER:** Is

21   Mr. Guzman going to be speaking with us today?

22           **ATTORNEY RUTLEDGE:** He will not speak on

23   the facts of the crime, but he will answer any

24   other questions the Board has.

25           **PRESIDING COMMISSIONER FISHER:** Okay.

26   We'll use then -- Let's see here. We'll use the

27   Appellate summary. I'm looking to see if

8

1    there's a prisoner's version, because the

2    current Board report doesn't have one.

3          **ATTORNEY RUTLEDGE:** You're looking for

4    what?

5          **PRESIDING COMMISSIONER FISHER:**

6    Prisoner's version, summary, yeah, but I'm not

7    seeing one. Basically the prisoner's versions

8    are all saying that he didn't want to talk about

9    the crime. So we'll just go with that. There's

10   a review of the life crime by him in '98 in the

11   psych report. I can use that, counsel, or I can

12   use the Board report where he simply says he

13   doesn't want to talk about it. Whichever you

14   prefer.

15         **ATTORNEY RUTLEDGE:** The '90 -- So you

16   won't use the Appellate one?

17         **PRESIDING COMMISSIONER FISHER:** Is there

18   a version from him in the Appellate one?

19         **ATTORNEY RUTLEDGE:** No. But we --

20         **PRESIDING COMMISSIONER FISHER:** There

21   isn't always.

22         **ATTORNEY RUTLEDGE:** Pardon?

23         **PRESIDING COMMISSIONER FISHER:** There

24   isn't always. I just need a prisoner's version.

25   I'm going to read the summary from the Appellate

26   transcript. But I also need a prisoner's

27   version of the crime.

9

```
 1          ATTORNEY RUTLEDGE:  Okay.  The '98 would
 2    be find.
 3          PRESIDING COMMISSIONER FISHER:  Okay.
 4    That's what'll I use then.  All right.  All
 5    right.  The summary of the crime is starting on
 6    page two of the Appellate decision and it says:
 7              "In accordance with the usual
 8              rules on Appeal the evidence
 9              established is that in November
10              1998, I'm sorry, 1988 at the
11              request of the defendant's wife,
12              Sofia Guzman, that's S-O-F-I-A,
13              and Maresela Garcia,
14              M-A-R-E-S-E-L-A, Garcia moved into
15              their residence.  She was to care
16              for appellant in the house while
17              Ms. Guzman went to Mexico with
18              Garcia's son who had been fathered
19              by the Guzman's son Felipe deJesus
20              Guzman."
21    All right.  Was this your -- Was she going with
22    your grandson, Mr. Guzman?
23          INMATE GUZMAN THROUGH INTERPRETER:  Who?
24    Maresela?
25          PRESIDING COMMISSIONER FISHER:  No.  Was
26    your wife going to Mexico with your son or your
27    grandson?
```

10

1          **INMATE GUZMAN THROUGH INTERPRETER:**   With

2     both.   She took my grandson.

3          **PRESIDING COMMISSIONER FISHER:**   Okay.

4     That's what I thought it meant.   All right.

5               "On Christmas day Garcia, together

6               with appellant, went to her

7               parents' home for Christmas

8               dinner.   Appellant was a close

9               friend of that family.   Appellant

10              conversed and drank beer with

11              Garcia's father, Pasqual Garcia.

12              At approximately 10 o'clock that

13              night appellant told Maresela

14              Garcia that he loved her and asked

15              her to come to his home.   She    .

16              refused to go explaining that she

17              was engaged to be married.

18              Appellant replied, well, that's

19              your decision.   Before leaving,

20              appellant told her, you might not

21              see me no more.   I'm going to hurt .

22              you where it hurts you the most.

23              He drove away rapidly and five to

24              10 minutes later returned and

25              continuously honked the horn.

26              When Bertha Garcia went outside to

27              see what he wanted, he told her to

11

| | |
|---|---|
| 1 | tell Maresela Garcia that it was |
| 2 | her last chance. She returned to |
| 3 | the house and conveyed the |
| 4 | appellant's message at which time |
| 5 | Pasqual Garcia went outside. As |
| 6 | he walked towards the driver's |
| 7 | side of the van, he said, que |
| 8 | pasa, and put his hands out, palms |
| 9 | up. Appellant responded by firing |
| 10 | a semiautomatic rifle three times |
| 11 | inflicting two fatal wounds on |
| 12 | Pasqual Garcia. One in the side |
| 13 | and one in the throat. The wounds |
| 14 | were inflicted from a range of two |
| 15 | feet or less. Appellant left the |
| 16 | van, stood over the victim and |
| 17 | pointed the rifle at him. He then |
| 18 | pointed the rifle at Bertha Garcia |
| 19 | who was standing on the porch and |
| 20 | said quote 'I'm going to kill you' |
| 21 | end quote or quote 'I'm going to |
| 22 | shoot you' end quote. She saw him |
| 23 | moving his finger near the trigger |
| 24 | but the rifle did not fire. She |
| 25 | then ran inside. Pablo Garcia, |
| 26 | Maresela Garcia's brother, rushed |
| 27 | outside when he heard the shots |

12

| | |
|---|---|
| 1 | and saw appellant pointing a rifle |
| 2 | at the fallen victim. He screamed |
| 3 | at appellant and asked why he had |
| 4 | shot his father. Appellant |
| 5 | turned, pointed the rifle at Pablo |
| 6 | Garcia and turned the trigger area |
| 7 | in his finger -- I mean -- in his |
| 8 | hands -- turned the trigger area |
| 9 | in his hands. Pablo Garcia |
| 10 | dropped to the ground to avoid |
| 11 | being shot and then hid behind the |
| 12 | van. Shortly thereafter Pablo and |
| 13 | Johnny Chacon, C-H-A-C-O-N, a |
| 14 | neighbor, were able to rush |
| 15 | appellant and wrestle the rifle |
| 16 | from him. During the struggle, |
| 17 | appellant tried to point the rifle |
| 18 | at them and the weapon was fired |
| 19 | twice." |
| 20 | All right. It is a complicated version. All |
| 21 | right. According to the 1998 psych evaluation, |
| 22 | under review of life crime this is what |
| 23 | Mr. Guzman had to say about what happened. It |
| 24 | says: |
| 25 | "He was able to describe some of |
| 26 | the circumstances surrounding his |
| 27 | commitment offense. He stated he |

13

1           actually remembers nothing in the
2           crime itself and feels that it was
3           an accident.  He said he was very
4           drunk and undoubtedly lost
5           complete control of himself.  He
6           understands that he's ruined many
7           lives, including the lives of his
8           family as well as the victim's
9           family, and knows that the damage
10          will never be removed.  His
11          remorse appeared to be rather
12          superficial."

13      **DEPUTY COMMISSIONER MCBEAN:**  At the end
14  of that paragraph is a footnote with his
15  version.

16      **PRESIDING COMMISSIONER FISHER:**  Good.
17  Thank you.  I'll read that too.  Okay.  I'm back
18  in the Appellate report here.

19      **DEPUTY COMMISSIONER MCBEAN:**  Page four.

20      **PRESIDING COMMISSIONER FISHER:**  Okay.
21  Thank you.  On page four there's a footnote.
22  Commissioner McBean just pointed out to me it's
23  at the bottom of the summary of the crime.  And
24  it states:

25          "Pablo Garcia grabbed appellant
26          and asked him why he had shot his
27          father.  Appellant said, because

14

1          of your sister.  Johnny Chacon
2          remembered appellant saying, yeah,
3          I killed him, I did it, I did it.
4          Appellant also told the victim's
5          wife that he wanted to do
6          something to make them suffer.
7          When asked by a neighbor whether
8          he was conscious of what he had
9          done, appellant calmly replied, I
10         wanted to do it.  I wanted to do
11         something to them that would hurt
12         as much as it was hurting me.
13         Appellant then entered the Garcia
14         residence, went into the kitchen,
15         (indiscernible) a cup of coffee
16         and waited for the police to
17         arrive.  When they arrived he
18         said, here I am, I'm the one that
19         did it.  I did it."
20    All right.  Counsel, since I'm not going to be
21    asking Mr. Guzman any questions is there
22    anything about what I read that you need to
23    comment on?

24         **ATTORNEY RUTLEDGE:**  There's a report I
25    read that says that he'd been drinking for days.
26    I think maybe it's the probation report.  He'd
27    been drinking for days prior to the incident and

15

1  in fact was drinking that night of Christmas
2  night.

3      **PRESIDING COMMISSIONER FISHER:**  Okay.  It
4  is in the probation officer's report.  It says
5  that he'd been consuming alcoholic beverages and
6  that the people who were around the area
7  believed he was drunk.

8      **ATTORNEY RUTLEDGE:**  And then also in his
9  interview with the police the following morning
10  he still smelled like alcohol and appeared to be
11  (indiscernible).

12      **PRESIDING COMMISSIONER FISHER:**  Okay.
13  All right.

14      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  It's
15  on page four of the Appellant --

16      **PRESIDING COMMISSIONER FISHER:**  Yeah.
17  Got it.  Okay.  Mr. Guzman, I'm going to move
18  on.  I'm going to talk to you about your life
19  before you came to prison for this crime.  All
20  right.  According to the information that I have
21  he has no prior criminal history.

22      **INMATE GUZMAN THROUGH INTERPRETER:**  Just
23  with immigration.

24      **PRESIDING COMMISSIONER FISHER:**  Okay.
25  Yeah.  You were in the Country illegally.  Is
26  that correct?

27      **INMATE GUZMAN THROUGH INTERPRETER:**  When

16

1   I came in at first, yes, but then I became

2   legal.

3           **PRESIDING COMMISSIONER FISHER:** Did you?

4   Okay. All right. According to this information

5   that I have, this is a little bit old, this is

6   from the 1998 psychological evaluation so some

7   of this may not be correct anymore. Let's see

8   here. At that time your mom was still alive.

9   Is she alive now, your mother?

10          **INMATE GUZMAN THROUGH INTERPRETER:** She

11  passed away. She's no longer living.

12          **PRESIDING COMMISSIONER FISHER:** Okay.

13  According to this you had 14 brothers and

14  sisters. Is that correct?

15          **INMATE GUZMAN THROUGH INTERPRETER:** Yes.

16          **PRESIDING COMMISSIONER FISHER:** All

17  right. Are all of them still alive?

18          **INMATE GUZMAN THROUGH INTERPRETER:** Yes,

19  right now, yes.

20          **PRESIDING COMMISSIONER FISHER:** All

21  right. Are you still in contact with them?

22          **INMATE GUZMAN THROUGH INTERPRETER:** With

23  some of them.

24          **PRESIDING COMMISSIONER FISHER:** All

25  right. According to the information that I have

26  you've been married for what, about 40 years

27  now? You still married?

17

1      **INMATE GUZMAN THROUGH INTERPRETER:** Yes,

2  I'm still married.

3      **PRESIDING COMMISSIONER FISHER:** Okay.

4  And you have six children?

5      **INMATE GUZMAN THROUGH INTERPRETER:** Yes,

6  six children.

7      **PRESIDING COMMISSIONER FISHER:** All

8  right. And how are they all doing?

9      **INMATE GUZMAN THROUGH INTERPRETER:**

10  They're fine.

11      **PRESIDING COMMISSIONER FISHER:** Are they

12  here -- are they here -- Are they still here in

13  the United States or are they in Mexico?

14      **INMATE GUZMAN THROUGH INTERPRETER:**

15  They're here in the U.S.

16      **PRESIDING COMMISSIONER FISHER:** Okay.

17  And are you --

18      **INMATE GUZMAN THROUGH INTERPRETER:** One

19  of them is in Mexico.

20      **PRESIDING COMMISSIONER FISHER:** Okay.

21  And do you stay in regular contact with them?

22      **INMATE GUZMAN THROUGH INTERPRETER:** Just

23  about with all of them.

24      **PRESIDING COMMISSIONER FISHER:** All

25  right. It says that you had what the doctor

26  called a significant problem with alcohol. Is

27  that right?

18

1           **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

2           **PRESIDING COMMISSIONER FISHER:**  Okay.

3    Did you use any other drugs?

4           **INMATE GUZMAN THROUGH INTERPRETER:**  No,

5    never.

6           **PRESIDING COMMISSIONER FISHER:**  Okay.

7    And when you were on the outside, how much were

8    you -- how much were you drinking?  How often?

9           **INMATE GUZMAN THROUGH INTERPRETER:**  Well,

10   I wasn't a frequent drinker.  I mean I'm

11   ignorant as far as how I got hooked at one time

12   with that uncontrolled drunkenness.

13          **PRESIDING COMMISSIONER FISHER:**  So did

14   you not usually do that?

15          **INMATE GUZMAN THROUGH INTERPRETER:**  No.

16          **PRESIDING COMMISSIONER FISHER:**  Do you

17   think you were an alcoholic?

18          **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

19   An alcoholic is someone who starts drinking and

20   just doesn't hold back (indiscernible).

21          **PRESIDING COMMISSIONER FISHER:**  And how

22   often would you do something like that?

23          **INMATE GUZMAN THROUGH INTERPRETER:**  Well

24   it had been 11 years since I hadn't drank

25   anything before that.

26          **PRESIDING COMMISSIONER FISHER:**  Before

27   this crime?  What made you decide to drink that

19

1   day?

2          **INMATE GUZMAN THROUGH INTERPRETER:**  I
3   don't understand what made me.

4          **PRESIDING COMMISSIONER FISHER:**  Okay.
5   Why had you not been drinking?  Had you decided
6   that you had a problem with alcohol?

7          **INMATE GUZMAN THROUGH INTERPRETER:**  Just
8   because I wanted to devote myself to my family.

9          **PRESIDING COMMISSIONER FISHER:**  All
10  right.

11         **INMATE GUZMAN THROUGH INTERPRETER:**  See
12  if (indiscernible) do something for the future.

13         **PRESIDING COMMISSIONER FISHER:**  Okay.
14  All right.  Without talking about your crime,
15  can you tell me how you feel what you did?

16         **INMATE GUZMAN THROUGH INTERPRETER:**  Well
17  I can tell you -- I could tell you some things
18  but it's difficult for me to (indiscernible) one
19  of those damages (indiscernible) family.  I mean
20  when I would arrive there, the children would
21  come out and meet me.  And having taken away
22  their sole provider, that is their father, he
23  was the only one working, the rest were in
24  school.

25         **PRESIDING COMMISSIONER FISHER:**  All
26  right.

27         **INMATE GUZMAN THROUGH INTERPRETER:**

20

1   That's what hurts me. As far as I'm concerned,
2   it doesn't matter. I think I'm on my way out,
3   but those children --

4       **PRESIDING COMMISSIONER FISHER:** All
5   right. What about Mr. -- What about Mr. Garcia?
6   How do you feel about him?

7       **INMATE GUZMAN THROUGH INTERPRETER:** Very
8   bad. I don't think there's anyway to justify a
9   murder. I don't think we're allowed to take
10  someone's life away like that. He was my best
11  friend.

12      **PRESIDING COMMISSIONER FISHER:** All
13  right. Let's talk about your parole plans. The
14  information that I have here says that you --
15  let's see -- at the time in November you were
16  working on -- waiting for support letters and
17  working on your parole plans. It says that
18  you'd be working on the family ranch in Mexico.
19  Is that correct?

20      **INMATE GUZMAN THROUGH INTERPRETER:** Yes.
21      **PRESIDING COMMISSIONER FISHER:** All
22  right. And who lives at the ranch currently?
23      **INMATE GUZMAN THROUGH INTERPRETER:** My
24  younger brother.

25      **PRESIDING COMMISSIONER FISHER:** Okay.
26  And there's a home there that you could live in?
27      **INMATE GUZMAN THROUGH INTERPRETER:** Yes.

21

1          **PRESIDING COMMISSIONER FISHER:**  All
2     right.  Did you have this ranch before you came
3     to the United States?

4          **INMATE GUZMAN THROUGH INTERPRETER:**
5     That's where I was raised.  That's where I was
6     raised up to 19-years-old.

7          **PRESIDING COMMISSIONER FISHER:**  Okay.  So
8     if you had the ranch before you came here, what
9     was the reason for coming to the U.S.?

10          **INMATE GUZMAN THROUGH INTERPRETER:**  We
11     came over with -- I had four children.  It was
12     very difficult to support them over there.

13          **PRESIDING COMMISSIONER FISHER:**  Do you
14     think you can --

15          **INMATE GUZMAN THROUGH INTERPRETER:**  A
16     better life for my children.

17          **PRESIDING COMMISSIONER FISHER:**  Do you
18     think you can support yourself there now?

19          **INMATE GUZMAN THROUGH INTERPRETER:**  Yes,
20     it's just for me and my wife.

21          **PRESIDING COMMISSIONER FISHER:**  Okay.
22     All right.  I have a letter here from Mary
23     Clare, that's C-L-A-R-E, Lynch, L-Y-N-C-H.
24     She's with the International Convention of
25     Alcoholics Anonymous.  She says they do have an
26     address in Guadalajara for AA and she gives you
27     the information.  And says:  "We're grateful you

22

1    took the time to write.  All of us here at the
2    general services office send our best wishes."
3    So essentially this was a response to your
4    letter looking for information.  Is that
5    correct?

6         **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.
7         **PRESIDING COMMISSIONER FISHER:**  All
8    right.  I also have -- I have several letters of
9    support here in the file for you.  I'm not going
10   to read them into the record.  But I do want to
11   note we have several and they've been
12   translated.  Many of them have been translated
13   from Spanish to English.  I have a letter here
14   from your wife dated October of 2004.  And she
15   says:  "My husband has always been a
16   responsible, honest and kind person.  He was
17   always ready to lend a hand to family members,
18   to friends and even to people he hardly knew."
19   Says:  "If he's allowed to stay in the United
20   States, he will stay and live at my daughter's
21   house."  And let's see here.  "If he is to live
22   out of the United States, then we'll live in
23   Mexico where his family has a ranch and all his
24   needs are provided."  I also have a letter from
25   your daughter Norma who says that you would be
26   -- you would be able to live with her and her
27   family in Spring Valley.  And that if you have

23

1    to live out of California that she's willing to
2    help you with housing, food, clothing, money and
3    whatever is needed.  The other's I'm not going
4    to read in the record.  The rest are just
5    generally supportive letters.  The Board of
6    Prison Terms does send out something called 3042
7    Notices.  And we received a response from the
8    Los Angeles Police Department and I'm going to
9    read it to you.  It says:

10              "The commitment offense was
11              carried out in a manner which
12              exhibited a callous disregard for
13              the life or suffering of another.
14              The motive for the crime was very
15              trivial in relation to the
16              offense.  Jose Guzman murdered the
17              victim by shooting him with a
18              firearm after a verbal argument.
19              Witnesses held him at the scene
20              until police arrived.  We
21              recommend his parole be denied.
22              It's the department's position to
23              adamantly oppose the release of
24              this inmate back into the
25              community."

26    Is there anything else about your parole plans
27    that we haven't talked about, Mr. Guzman?

24

1        **INMATE GUZMAN THROUGH INTERPRETER:** No.

2        **ATTORNEY RUTLEDGE:** We just wanted to --

3    There's a letter from the Mexican government

4    that confirms that Mr. Guzman owns property

5    there in Mexico and they're welcoming him back.

6        **PRESIDING COMMISSIONER FISHER:** Okay.

7        **ATTORNEY RUTLEDGE:** And then he's got a

8    job offer as well from a Senora Beatrice Guzman

9    Palayo (phonetic). It looks like he's her

10   nephew and she has said that he can work on

11   their farm. Most of the family works in

12   agriculture. The family has a farm. Also, I

13   think you read the one from his daughter Norma.

14   That she's --

15       **PRESIDING COMMISSIONER FISHER:** Yeah.

16       **ATTORNEY RUTLEDGE:** He has an INS hold,

17   but she stated that he could live with her. And

18   then there's also one I wanted to bring to your

19   attention from Martha Guzman, his niece, who

20   said what a hard working, giving man he was and

21   he would feed homeless people. Anyway, she's

22   just sort of supporting his character as far as

23   what his wife said in a previous letter.

24       **PRESIDING COMMISSIONER FISHER:** Okay. I

25   don't have -- I don't seem to have any of --

26   Here it is. Here's Martha Guzman's -- I was

27   going to say I didn't have the ones that you had

25

1    mentioned.  All right.  But just generally

2    supportive, not offering a home or --

3              **ATTORNEY RUTLEDGE:**  No.  No, no.

4              **PRESIDING COMMISSIONER FISHER:**  Okay.

5              **ATTORNEY RUTLEDGE:**  Yeah, just into his

6    character, his previous social character before

7    he committed the offense.

8              **PRESIDING COMMISSIONER FISHER:**  All

9    right.  Okay.  Thank you.  If you'll turn your

10   attention, Mr. Guzman, to Commissioner McBean

11   she's going to go through your post-conviction

12   factors with you.

13             **DEPUTY COMMISSIONER MCBEAN:**  Good

14   morning, Mr. Guzman.  In this phase of the

15   hearing we'll be looking at your institutional

16   adjustment.  I've reviewed the Central File, the

17   Board report, the psych evaluations.  And if I

18   miss anything, I'll give you and your attorney

19   an opportunity to add some things.  I see you

20   last appeared before the Board of Prison Terms

21   on November 4, 2003.  At that time you were

22   given a one year denial and you were asked to

23   remain disciplinary-free, to upgrade

24   educationally and to participate in self-help

25   and therapy.  You have a current classification

26   score of 19.  Your custody level is Medium-A.

27   And it looks like you've been working hard on

26

1    your English skills for a long time.  I saw that

2    you were in ESL from '93 to '95.  Is that

3    correct?

4         **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

5         **DEPUTY COMMISSIONER MCBEAN:**  And then

6    after that from like '98 until the present time

7    you've been working in ABE.  Is that correct?

8         **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

9         **DEPUTY COMMISSIONER MCBEAN:**  And you've

10   really done well.  You've brought your TABE

11   score up from 2.8 up to a high of 10.2.  And you

12   do have some laudatory chronos in the file

13   indicating that you're very hard working in

14   school and you now stay on track and on purpose

15   and are really trying to do your best.  You've

16   not yet acquired your GED.  But are you working

17   towards that?

18        **INMATE GUZMAN THROUGH INTERPRETER:**  I'm

19   working on it.

20        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  All

21   right.  And you're really making progress.  So

22   you've done -- You've done a good job there.  So

23   you haven't completed any vocational trades.

24   You've been working on your language skills and

25   your education throughout your entire

26   incarceration.  Is that right?

27        **INMATE GUZMAN THROUGH INTERPRETER:**  Yes.

27

1        **DEPUTY COMMISSIONER MCBEAN:** What kind of

2 work did you say you did on the streets before

3 your life crime?

4        **INMATE GUZMAN THROUGH INTERPRETER:** I was

5 a cook.

6        **DEPUTY COMMISSIONER MCBEAN:** Okay. So

7 how many years did you work in this Country?

8        **INMATE GUZMAN THROUGH INTERPRETER:** I

9 worked 18 years here in the U.S.

10        **DEPUTY COMMISSIONER MCBEAN:** Did you pay

11 into social security or anything like that?

12        **INMATE GUZMAN THROUGH INTERPRETER:** Yes.

13 I have all of that. I did my reports every

14 year.

15        **DEPUTY COMMISSIONER MCBEAN:** Okay.

16 Because you were an illegal alien, right, you

17 have an immigration hold?

18        **INMATE GUZMAN THROUGH INTERPRETER:** I was

19 here with a permit. I just (indiscernible) so

20 then in 1988 I obtained my green card.

21        **ATTORNEY RUTLEDGE:** They take it when

22 they get a felony.

23        **DEPUTY COMMISSIONER MCBEAN:** Right. But

24 he still paid into the system for a lot of

25 years. I think he would still be entitled to

26 benefits somehow.

27        **INMATE GUZMAN THROUGH INTERPRETER:** I mean

28

1    if I'm released, I'll be deported to Mexico.

2        **DEPUTY COMMISSIONER MCBEAN:**   Right.

3    Okay.   So as far as you know are you entitled to

4    any kind of benefits when you -- even upon

5    deportation?

6        **INMATE GUZMAN THROUGH INTERPRETER:**   I

7    don't know if I can obtain it if I'm out of the

8    Country.   I will need to know that -- inform

9    myself.

10       **DEPUTY COMMISSIONER MCBEAN:**   Yeah.   You

11   could probably research that a little and find

12   out.   Because if you literally paid into social

13   security for 18 years in this Country you might

14   be entitled to something.   From a self-help

15   standpoint you've been participating in AA for

16   about 10 years since 1995 on a regular basis.

17   Is that right, Mr. Guzman?

18       **INMATE GUZMAN THROUGH INTERPRETER:**   Yes.

19       **DEPUTY COMMISSIONER MCBEAN:**   And I was

20   looking through the records here.   I noticed

21   that the POR indicated you stated you began

22   drinking heavily for two years prior to the life

23   crime and that during December he would drink

24   one-half pints of Tequila everyday.   That's what

25   the probation officer's report says.   Is that --

26   Is that right?

27       **INMATE GUZMAN THROUGH INTERPRETER:**

29

1    (Indiscernible) there with the interpreter when

2    I went to the interview.  And I said about 12

3    years and he understood two.

4         **DEPUTY COMMISSIONER MCBEAN:**  You were

5    drinking for 12 years?

6         **INMATE GUZMAN THROUGH INTERPRETER:**  No, I

7    was -- I hadn't drank for 12 years.

8         **DEPUTY COMMISSIONER MCBEAN:**  I see.

9         **PRESIDING COMMISSIONER FISHER:**  He said

10   earlier to me that he hadn't been drinking for

11   about 11 years.

12        **DEPUTY COMMISSIONER MCBEAN:**  I know he

13   said that, but --

14        **INMATE GUZMAN THROUGH INTERPRETER:**  And I

15   had been drinking for about 19 days when this

16   happened.

17        **DEPUTY COMMISSIONER MCBEAN:**  I noticed --

18   Because I know you said that but it just wasn't

19   adding up for me.  And I looked in the

20   psychological evaluation of 1993 and it

21   indicated that you attempted -- I'm just going

22   to read this.  "He attempted to portray himself

23   as a modest consumer of alcohol from the age of

24   14 through 1976."  And then -- let's see.

25             "However, he then stated that he

26             learned that his wife was not

27             coming back to the United States

```
 1          over the holidays.  He stated his
 2          excessive drinking was related to
 3          the instant offense only, denied
 4          having been a previous -- any
 5          previous blackouts.  But he
 6          acknowledged heavy drinking during
 7          December.  However, upon further
 8          inquiry it was learned he often
 9          had periods of consuming alcohol
10          and being physically ill or
11          vomiting well before the instant
12          offense in December of '88."
13     So it sounds like you were drinking pretty
14     heavily for a period of time.  It's kind of been
15     hard to focus in on how much time that was.  How
16     long do you think you were actually drinking
17     heavily before the life crime?
18          INMATE GUZMAN THROUGH INTERPRETER:
19     Nineteen days.
20          DEPUTY COMMISSIONER MCBEAN:  Okay.  How
21     much were you drinking each of those 19 days?
22     Were you drinking --
23          INMATE GUZMAN THROUGH INTERPRETER:  When
24     I drank less, I drank five half-pints of
25     Tequila.
26          DEPUTY COMMISSIONER MCBEAN:  Every day?
27          INMATE GUZMAN THROUGH INTERPRETER:  Other
```

31

1   days I drank more.

2        DEPUTY COMMISSIONER MCBEAN:  That's a lot

3   of Tequila.  I'm surprised that didn't kill you.

4        INMATE GUZMAN THROUGH INTERPRETER:

5   That's why I'm surprised too.  I just would

6   drink at night.

7        DEPUTY COMMISSIONER MCBEAN:  Okay.

8        INMATE GUZMAN THROUGH INTERPRETER:  And I

9   would drink -- I'm sorry -- I would sleep and I

10  would have to go to work.

11       DEPUTY COMMISSIONER MCBEAN:  All right.

12  So for almost three weeks before the life crime

13  you would drink five half-pints of Tequila and

14  still go to work?

15       INMATE GUZMAN THROUGH INTERPRETER:  Yes.

16  I would fall asleep and then I was able to go to

17  work.

18       DEPUTY COMMISSIONER MCBEAN:  I see.  All

19  right.  Now Mr. Guzman, do you know the

20  12-steps?

21       INMATE GUZMAN THROUGH INTERPRETER:  In

22  Spanish.

23       DEPUTY COMMISSIONER MCBEAN:  Okay.  Well

24  tell me which one of the steps that you use the

25  most frequently.

26       INMATE GUZMAN THROUGH INTERPRETER:  Four,

27  eight and nine.

32

1      **DEPUTY COMMISSIONER MCBEAN:**  And what do
2    they say?

3      **INMATE GUZMAN THROUGH INTERPRETER:**  Four
4    says that fearlessly we made a moral inventory
5    of ourselves.  Eight says that we made a list of
6    all the people we have offended and
7    (indiscernible) need to repair -- make up the
8    damage that we caused.  Nine, we prepared the
9    damage to those that we directly harmed except
10   that when doing so would harm them more damage.

11     **DEPUTY COMMISSIONER MCBEAN:**  So you find
12   you're using the steps in your life?

13     **INMATE GUZMAN THROUGH INTERPRETER:**  I
14   (indiscernible) I would have to continue in the
15   program for the rest of my life.  I don't want
16   to run the risk of harming anyone
17   (indiscernible).

18     **DEPUTY COMMISSIONER MCBEAN:**  How are you
19   going to prevent yourself from returning to the
20   use of alcohol on release?

21     **INMATE GUZMAN THROUGH INTERPRETER:**  How
22   do you mean?

23     **DEPUTY COMMISSIONER MCBEAN:**  I'm sorry?
24     **INMATE GUZMAN THROUGH INTERPRETER:**  How
25   do you mean?

26     **DEPUTY COMMISSIONER MCBEAN:**  Are you
27   going to keep yourself from drinking when you're

1   paroled someday?

2         **INMATE GUZMAN THROUGH INTERPRETER:**  Well,
3   first of all with God's help.  I think he's the
4   only one that can help us.  I mean, I don't
5   think there's any medicine.  Because what
6   happened to me (indiscernible) taking the life
7   away from someone, how one can reach that moment
8   and to be able to (indiscernible) the danger and
9   the harm you can cause because of alcohol.

10        **DEPUTY COMMISSIONER MCBEAN:**  So you're
11  going to use the steps and God's help.  Is that
12  right?

13        **INMATE GUZMAN THROUGH INTERPRETER:**  Yes,
14  God's help and the steps.

15        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  Any
16  other self-help groups that you've participated
17  in during your incarceration?

18        **INMATE GUZMAN THROUGH INTERPRETER:**
19  Alcoholics and Narcotics Anonymous, the same
20  thing.  Nothing else, it's the same thing.

21        **DEPUTY COMMISSIONER MCBEAN:**  Okay.  Thank
22  you.  I see you have no CDC 115's or 128's.  So
23  you're to be commended for that.  You have not
24  ever gotten a write-up of any kind.  And that
25  includes for alcohol or pruno or anything so I
26  was happy to see that.  From a psych point of
27  view, your most recent psych is 8-28-03 by

34

1    Dr. Hewchuk, H-E-W-C-H-U-K. He says:

2           "Due to his advanced age and total

3           institutional compliance during

4           incarceration, he poses an

5           extremely low risk if released to

6           the community. He has openly

7           acknowledged his history of

8           alcohol abuse and poor judgment

9           and has spent the last 15 years

10          actively working towards change.

11          He has good insight into his prior

12          behavior and is fully remorseful

13          for his offense."

14   And he notes that due to low risk factors and

15   close family support inmate Guzman is

16   appropriate for release with a negligible

17   probability of recidivism. Okay. Was there

18   anything else you wanted to add in terms of your

19   overall institutional adjustment or

20   accomplishments that I may have missed?

21          **INMATE GUZMAN THROUGH INTERPRETER:** No, I

22   think that's fine.

23          **DEPUTY COMMISSIONER MCBEAN:** Okay. Thank

24   you. Counsel, anything to add?

25          **ATTORNEY RUTLEDGE:** As far as his

26   achievements go, no.

27          **DEPUTY COMMISSIONER MCBEAN:** Okay.

35

1          **ATTORNEY RUTLEDGE:** Covers it all.

2          **DEPUTY COMMISSIONER MCBEAN:** Thank you.

3     Return to the Chair then.

4          **PRESIDING COMMISSIONER FISHER:** All

5     right.  Thank you.  I don't have any questions

6     that aren't related to the crime.  Do you have

7     anything?

8          **DEPUTY COMMISSIONER MCBEAN:** No, I don't.

9    ˙Thanks.

10         **PRESIDING COMMISSIONER FISHER:** Okay.

11    Mr. Delavigne, do you have anything -- any

12    questions?

13         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Yes,

14    regarding his plans if he is allowed out on

15    parole.  And his plans as he indicated are to be

16    with his wife.  And I would ask the Panel to ask

17    him if she is aware of the circumstances, all

18    the circumstances and facts of the night of the

19    shooting?

20         **PRESIDING COMMISSIONER FISHER:** Do you

21    understand the question?

22         **INMATE GUZMAN THROUGH INTERPRETER:** I

23    think she's aware of it because she would go to

24    the court hearing.  She was there.

25         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Is

26    she aware of your relationship and your feelings

27    toward Maresela Garcia?

36

1          **INMATE GUZMAN THROUGH INTERPRETER:** I
2     think so because that was brought out there.
3          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** That
4     was brought out in court?
5          **INMATE GUZMAN THROUGH INTERPRETER:** Yes.
6     Maresela said that.
7          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** I
8     have no further questions.
9          **PRESIDING COMMISSIONER FISHER:** All
10    right. I have a follow-up question then because
11    I was wondering the same thing. I just wasn't
12    going to go there. Have you talked to her about
13    it?
14         **INMATE GUZMAN THROUGH INTERPRETER:** With
15    my wife?
16         **PRESIDING COMMISSIONER FISHER:** Yes.
17         **INMATE GUZMAN THROUGH INTERPRETER:** I
18    told her once at the first visit that she --
19    when she came.
20         **PRESIDING COMMISSIONER FISHER:** You told
21    her once what?
22         **INMATE GUZMAN THROUGH INTERPRETER:** I
23    told her what happened.
24         **PRESIDING COMMISSIONER FISHER:** Okay.
25         **INMATE GUZMAN THROUGH INTERPRETER:** With
26    Maresela.
27         **PRESIDING COMMISSIONER FISHER:** All

37

1    right.  So your wife understands that this was

2    about you claiming that you were in love with

3    Maresela?

4         INTERPRETER ZAVALA:  I'm sorry, that you

5    were?

6         PRESIDING COMMISSIONER FISHER:  Claiming

7    to be in love with Maresela.

8         INMATE GUZMAN THROUGH INTERPRETER:  Well,

9    I (indiscernible) necessarily in love but it was

10   (indiscernible) mistake as a result of the

11   alcohol.

12        PRESIDING COMMISSIONER FISHER:  So in

13   other words your wife really doesn't know what

14   was going on?

15        INMATE GUZMAN THROUGH INTERPRETER:  I

16   didn't know what was going on.  I lost my mind

17   completely.

18        PRESIDING COMMISSIONER FISHER:  I figured

19   that's where we were going to go with this line

20   of questions.  Counsel, do you have any

21   questions?

22        ATTORNEY RUTLEDGE:  Yes.  Did you not

23   discuss this with your wife because -- You said

24   you discussed it with your wife.  But you -- Did

25   you actually have a relationship with Maresela?

26        INMATE GUZMAN THROUGH INTERPRETER:  Yes.

27        ATTORNEY RUTLEDGE:  All right.  And this

38

1    all came -- These facts all came out then at the
2    -- in court?

3           **INMATE GUZMAN THROUGH INTERPRETER:** Yes.
4           **ATTORNEY RUTLEDGE:** All right. So do you
5    think your wife just attributed it to your
6    drinking?

7           **INMATE GUZMAN THROUGH INTERPRETER:** Well,
8    she never brought that up. I mean, every time
9    they did the family visits when they allowed
10   that she would always come, but she never
11   brought that up.

12          **ATTORNEY RUTLEDGE:** Okay.

13          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Could
14   I ask another question?

15          **PRESIDING COMMISSIONER FISHER:** We're all
16   starting to pop up with other questions around
17   this.

18          **ATTORNEY RUTLEDGE:** I'm finished. Go
19   ahead.

20          **PRESIDING COMMISSIONER FISHER:** Go ahead.
21          **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Would
22   you ask him if he ever personally told his wife
23   that he was in love with Maresela and wanted
24   Maresela to come live with him?

25          **INMATE GUZMAN THROUGH INTERPRETER:** In
26   love, I've never been in love with Maresela.
27   There was an adventure there with the

39

1    alcoholism, but no, not being in love.

2    **PRESIDING COMMISSIONER FISHER:** All

3    right. All right. Mr. Guzman, you told -- the

4    witnesses said that you said that you were in

5    love with Maresela and that you wanted her to

6    run away with you, which is why we're all

7    questioning why your wife would still be around

8    after all these years if she knew what was going

9    on. I have another question for you. Do you

10    have a relationship of any kind of Maresela now?

11    **INMATE GUZMAN THROUGH INTERPRETER:** No.

12    **PRESIDING COMMISSIONER FISHER:** All --

13    right. So all these years that you've been in

14    prison -- All these years that you've been in

15    prison have you essentially been lying to your

16    wife?

17    **INMATE GUZMAN THROUGH INTERPRETER:** No.

18    **DEPUTY COMMISSIONER MCBEAN:** Excuse me,

19    just a minute. I need to turn --

20    [Thereupon, the tape was turned over.]

21    **DEPUTY COMMISSIONER MCBEAN:** Back on

22    record.

23    **PRESIDING COMMISSIONER FISHER:** Okay. Go

24    ahead.

25    **INMATE GUZMAN THROUGH INTERPRETER:** I'm

26    not lying. I've never lied (indiscernible). I

27    told her the truth as far as what happened. The

40

1    grandson, he's still there with my wife and he

2    also has a child already.

3         **DEPUTY COMMISSIONER MCBEAN:** I don't know

4    what that has to do with anything.

5         **PRESIDING COMMISSIONER FISHER:**

6    (Indiscernible).

7         **ATTORNEY RUTLEDGE:** Can I ask him --

8         **PRESIDING COMMISSIONER FISHER:** Okay.

9    I'm sorry, what?

10        **ATTORNEY RUTLEDGE:** Can I ask him a

11   question?

12        **PRESIDING COMMISSIONER FISHER:** Sure, go

13   ahead.

14        **ATTORNEY RUTLEDGE:** How many years were

15   you married before this incident happened?

16        **INMATE GUZMAN THROUGH INTERPRETER:** I

17   couldn't tell you exactly how many, around 25

18   maybe.

19        **ATTORNEY RUTLEDGE:** Thank you.

20        **INMATE GUZMAN THROUGH INTERPRETER:**

21   Twenty-eight.

22        **PRESIDING COMMISSIONER FISHER:** How old

23   was Maresela at the time of the crime?

24        **INMATE GUZMAN THROUGH INTERPRETER:** She

25   was going to be 20.

26        **PRESIDING COMMISSIONER FISHER:** Okay.

27   Had you ever had sex with her?

41

1          **INMATE GUZMAN THROUGH INTERPRETER:** Not
2    before.
3          **PRESIDING COMMISSIONER FISHER:** Not
4    before what?
5          **INMATE GUZMAN THROUGH INTERPRETER:** Just
6    once.
7          **PRESIDING COMMISSIONER FISHER:** Okay.
8    That's what he said in the probation officer's
9    report. All right.
10         **DEPUTY COMMISSIONER MCBEAN:** No other
11   questions.
12         **PRESIDING COMMISSIONER FISHER:** How about
13   you?
14         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** I
15   have another question.
16         **PRESIDING COMMISSIONER FISHER:** Go ahead.
17         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:** Would
18   you ask him isn't the reason -- the whole
19   purpose behind the shooting and the cause of the
20   shooting was his love for Maresela and her
21   spurning him?
22         **DEPUTY COMMISSIONER MCBEAN:** And her
23   what?
24         **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**
25   Spurning him or saying that she wouldn't go with
26   him.
27         **INMATE GUZMAN THROUGH INTERPRETER:** I

42

1    couldn't tell you if that's true or not.  I

2    wasn't aware of myself at the time.

3            **PRESIDING COMMISSIONER FISHER:**  Have you

4    thought about it since you've been in prison?

5            **INMATE GUZMAN THROUGH INTERPRETER:**  Sure

6    I have, yes.

7            **PRESIDING COMMISSIONER FISHER:**  What

8    conclusions have you come to?

9            **INMATE GUZMAN THROUGH INTERPRETER:**  I

10   acknowledge the gravity of the offenses, the

11   mistakes.  I don't want to cause a nuisance or

12   (indiscernible) I would like to do something in

13   that regard, but --

14           **PRESIDING COMMISSIONER FISHER:**  All

15   right.

16           **INMATE GUZMAN THROUGH INTERPRETER:**  -- to

17   be able to help but there's nothing I can do.

18           **PRESIDING COMMISSIONER FISHER:**  All

19   right.  Mr. Guzman, thank you.  Anything else,

20   counsel?

21           **ATTORNEY RUTLEDGE:**  No further questions.

22           **PRESIDING COMMISSIONER FISHER:**  All

23   right.  Mr. Delavigne, would you like to close.

24           **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  Yes.

25   I oppose a granting of a date for this inmate.

26   First of all based on the life crime itself.

27   The reason behind the life crime was very

1    trivial.  It seemed that a 19-year-old girl was

2    spurning him when he was in his late 50's.  He

3    was 59 at the time.  He states that he doesn't

4    understand why he drank that day.  And I think

5    he needs further insight into his actions.  And

6    he is still not admitting the reason for the

7    crime, and that was his love for Maresela and

8    his feelings when she refused to go with him.

9    As far as his parole plans go and a future with

10   this wife, it is not clear to me still after all

11   these questions if his wife is aware that he had

12   a relationship with Maresela and was in love

13   with her.  And for those reasons I would oppose

14   a finding of suitability.

15         **PRESIDING COMMISSIONER FISHER:**  Thank

16   you.  Counsel.

17         **ATTORNEY RUTLEDGE:**  Going to the crime.

18   Mr. Guzman had been married for 25 years.  His

19   wife goes to Mexico and his -- kind of like his

20   daughter-in-law goes to help him out, you know,

21   which isn't a good situation when people are

22   married to be living with people of the opposite

23   sex.  They have some type of a tryst.  But I

24   think it's clear that he'd been drinking for 19

25   days.  Nowadays they call behavior like this a

26   drunken dial.  But he basically, you know, felt

27   at that moment that he wanted to be with her and

44

1   felt spurned which he -- and wasn't able to cope
2   at that moment with those feelings.  However,
3   you know, we're kind of speculating because the
4   guy was so drunk.  I'm not sure, you know -- I
5   don't know what kind of effect it would have on
6   somebody who drank Tequila for 19 days.  I
7   really don't.  But I think it's difficult for us
8   to speculate.  And I think his wife has to know.
9   These families are very close.  This was his
10  best friend.  This was his son -- This was the
11  mother of his grandchild.  So I don't think it's
12  unusual where people are married that many years
13  that they recover from an affair to keep the
14  family intact.  You know, this wasn't some
15  ongoing situation.  It looks like to me like his
16  wife wants to move toward the future.  You know,
17  she knows him better than we do.  Perhaps, you
18  know, she does feel that he's remorseful and
19  that he is sorry and does want to do well.
20  Turning to his factors of suitability.  He has
21  no juvenile record.  He has a very stable social
22  history.  Married 25 to 28 years prior to the
23  offense.  Had six children.  Worked to support
24  his family.  Had gotten a green card.  He
25  maintains those family ties to this day.  Is in
26  contact, he knows -- I've talked to him before
27  about his grandchildren and his children.  As

45

1    far as remorse goes, he does give clear

2    indicators that he understands the nature and

3    magnitude of the offense, the loss that he's

4    incurred upon these two families.  The

5    motivation for the crime, I don't know.  It's

6    hard to say again with somebody -- what happens

7    to the mind in that kind of a situation.  Lack

8    of criminal history.  He had -- I don't see any

9    convictions other than his illegal entry in the

10   United States.  And he has not one write-up

11   since he's been here.  Clearly, he knows how to

12   stay out of trouble in this setting and he did

13   that in a previous setting.  As far as age goes,

14   Mr. Guzman's going to be 75 this month.  So I

15   think it's clear that as far as posing an

16   unreasonable risk -- And all the psych reports

17   say he doesn't pose -- And his recent psych

18   report especially says he does not pose a risk

19   to society.  His institutional behavior is

20   excellent.  I mean, the guy comes in here, he's

21   been in education.  I don't know if you

22   mentioned this, but he didn't receive any

23   education in Mexico.  I was asking him, well,

24   how's the GED coming along.  He goes, well,

25   good, you know.  But he does struggle because he

26   wasn't even educated in his own language.  But

27   he stayed in there.  He's getting laudatory

46

1    chronos showing that he's doing well.  His TABE

2    score's up tremendously.  And he has been in AA

3    for 10 years now, understanding that he would

4    need to continue that treatment.  He's expressed

5    to the Board that he needs to do this everyday

6    for the reset of his life.  And he's contacted

7    AA International Board so that he can make

8    contact with AA in Mexico.  Going to his parole

9    plans.  He has parole plans there.  He owns

10   land.  He's got a family to go home to.  I would

11   say all of those things point in favor of

12   Mr. Guzman being paroled today.

13       **PRESIDING COMMISSIONER FISHER:**  Thank

14   you.  Mr. Guzman, is there anything you'd like

15   to add to what your attorney said on your

16   behalf?

17       **INMATE GUZMAN THROUGH INTERPRETER:**  No.

18   That's fine.

19       **PRESIDING COMMISSIONER FISHER:**  All

20   right.  Thank you.  We're going to go ahead and

21   recess.

22                    R E C E S S

23                     --oOo--

24

25

26

27

47

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2        **D E C I S I O N**

3        **DEPUTY COMMISSIONER MCBEAN:** Okay. We're

4   back on record.

5        **PRESIDING COMMISSIONER FISHER:** All

6   right. Thank you. I want to note for the

7   record that everyone who was previously in the

8   room and identified themselves have returned to

9   the room. Mr. Guzman, the Panel reviewed all of

10   the information received from the public and

11   relied on the following circumstances in

12   concluding that you're not yet suitable for

13   parole and would pose an unreasonable risk of

14   danger to society or a threat to public safety

15   if released from prison. I'm going to tell you

16   now that we're denying your parole for three

17   years. And I'm going to through the decision

18   here, but I'm going to explain to you why we've

19   come to this decision and what we'd like to see

20   you do. Certainly, the first thing that we

21   considered was Mr. Guzman's commitment offense.

22   This was the murder of someone who he referred

23   to today as his best friend, Pasqual Garcia, who

24   was the father of Maresela Garcia. It was a

25   19-year-old girl who had apparently given birth

26   to Mr. Guzman's grandson and who at some point

27   **JOSE GUZMAN   E-53800   DECISION PAGE 1   9/13/05**

48

1   Mr. Guzman had had sex with and who, after
2   getting drunk, became the unwilling recipient of
3   his affections. Mr. Guzman, after attempting to
4   get her to run away with him apparently, telling
5   her that he loved her, told her that he was
6   going to come back and hurt her in the place
7   that hurt her the most. What he did was he went
8   -- he went and got a rifle. It was loaded. He
9   came back to the home of his friend, his best
10  friend, Pasqual Garcia, and proceeded to try to
11  kill everybody there. He did kill Pasqual
12  Garcia. He shot him -- shot him twice at close
13  range from two feet away or less. He attempted
14  to shoot Bertha Garcia, Maresela's mother. In
15  fact, he attempted to fire the weapon and it
16  didn't fire. And she got away. Then he tried
17  to kill Pablo Garcia, Maresela's brother. He
18  probably would have continued to try to kill the
19  other people except that Pablo and a neighbor
20  finally grabbed Mr. Guzman and wrestled the
21  rifle away from him. In today's hearing
22  Mr. Guzman just simply indicated that he was
23  drunk. He didn't have any insight at all into
24  why he committed the crime. He was really
25  pretty flip about the situation with this
26  19-year-old girl. He said that he never loved
27  **JOSE GUZMAN   E-53800   DECISION PAGE 2   9/13/05**

49

1    her and that he couldn't really remember
2    anything about the situation because he was
3    drunk.   But apparently he was certainly
4    experiencing enough angst to try to go and kill
5    three people in order to upset her.   This
6    prisoner doesn't have any prior convictions.
7    However, he was -- he did come to the U.S.
8    illegally.   He indicated to us that he got his
9    green card after being here for a period of time
10   and then of course lost that after committing
11   this offense.   He's programmed in a very limited
12   manner while he's been incarcerated.   He has
13   been working in ABE.   He's indicated that he's
14   been working on getting his GED.   Apparently
15   he's been doing that since about 1998 if I'm
16   remembering correctly.   He has been
17   participating in AA since 1995.   But at this
18   point he's failed to upgrade vocationally.   He
19   hasn't upgraded educationally in that he doesn't
20   have his GED yet.   And he's certainly not
21   sufficiently participated in beneficial
22   self-help.   The only self-help he's been doing
23   is (indiscernible) substance abuse.   He has had
24   no 115's and no 128's during his incarceration.
25   The most recent psych evaluation is dated
26   8-28-03.   It's by Dr. Hewchuk.   And it is
27   **JOSE GUZMAN   E-53800   DECISION PAGE 3   9/13/05**

50

1  favorable.  Says he has good insight into his

2  prior behavior and is fully remorseful for his

3  offense.  Says that he believes that Mr. Guzman

4  is appropriate for release with negligible

5  probability of recidivism.  And I would

6  respectfully disagree with Dr. Hewchuk.

7  Mr. Guzman does have parole plans to Mexico.  He

8  does seem to have good family support.  It gives

9  me great pause, however, as I think it did

10  everyone else at the table here that there's

11  every reason to believe that Mr. Guzman's wife

12  who he will be living with after he's released

13  from prison doesn't know the facts of this

14  crime.  The hearing Panel notes that in response

15  to 3042 Notices the Los Angeles Police

16  Department and the Los Angeles District

17  Attorney's office both indicated an opposition

18  to a finding of suitability at this time.  The

19  Panel finds that the inmate needs to participate

20  in self-help in order to cope with stress in a

21  nondestructive manner, in order to build tools

22  related to his substance abuse when he is

23  released from prison and in order to gain

24  insight into his culpability in this offense as

25  well as the impact of his crime on others.  And

26  in order to be able to understand and talk about

27  **JOSE GUZMAN    E-53800    DECISION PAGE 4    9/13/05**

51

1    what he did and not just to sort of it pass it
2    off as something that happened while he was
3    drunk.  In view of his history and his lack of
4    program participation there's no indication that
5    he would behave differently if paroled.  We want
6    to commend you, Mr. Guzman, for the work that
7    you're doing in ABE, for participating in AA and
8    for the fact that you've been disciplinary-free
9    the entire time that you've been in prison.
10   That's really commendable.  However, currently
11   the positive aspects of behavior do not outweigh
12   the factors of unsuitability.  In a separate
13   decision the hearing Panel finds that the
14   prisoner has been convicted of murder and it's
15   not reasonable to expect that parole would be
16   granted at a hearing during the next three
17   years.  Once again, the specific reasons for
18   this finding are as follows.  The commitment
19   offense.  This was a horrible crime.  And the
20   fact that Mr. Guzman has displayed absolutely no
21   insight into this behavior or the impact of his
22   crime.  Frankly, the fact that it troubles me
23   that there's every indication that he has, if
24   not outwardly -- outright lied to his wife about
25   the reason for the crime, he certainly hasn't
26   made it a priority to make her understand what
27   **JOSE GUZMAN   E-53800   DECISION PAGE 5   9/13/05**

52

1    it was that happened. And she's included in his
2    parole plans. And the fact that he hasn't
3    completed the necessary programming that's
4    essential to his adjustment and needs additional
5    time to gain that programming. That,
6    Mr. Guzman, would be in the area of self-help.
7    We'd like to see you finish your GED. We'd like
8    to see you then get into a vocation, develop
9    some skills so that when you get out of prison,
10   if you're not able to support yourself on the
11   ranch, as you weren't able to support yourself
12   on the ranch before you came to the United
13   States, you'll have another skill. Get a job.
14   And we'd like to see you participate in some
15   self-help. If you can't do it through the
16   institution, then you can certainly do it on
17   your own. You can get some books and you can
18   work on things like anger management. You can
19   work on things like insight. You can work on
20   things like victim impact. And we'd like to see
21   you do that before you come back for your next
22   hearing. If you do the work on your own, all
23   you have to do is just kind of write a little
24   report to bring back to the Panel to show them
25   what you've been working on and what you've
26   learned from it. And that completes the reading
27   **JOSE GUZMAN    E-53800    DECISION PAGE 6    9/13/05**

53

1  of the decision.  Do you have any comments?

2      **DEPUTY COMMISSIONER MCBEAN:**  I would like

3  to make one comment, Mr. Guzman.  And that is it

4  was almost shocking to me how much you minimize

5  the extent of your alcohol use and how it led

6  you to your crime.  I'm sure you were drunk.  A

7  lot of people get drunk.  But they don't get,

8  you know, a rifle or a gun and leave and come

9  back and try to kill people with it.  You

10  initially told the Panel that you were only

11  drinking that day.  And then later you said you

12  were drinking for 19 days.  The file reflects

13  two years.  So I'm not sure we actually know

14  where the truth lies.  We know that you were

15  drinking a very excessive amount.  But you

16  cannot blame your crime on the alcohol.  And

17  that's what I think you're doing.  Until you can

18  explain to us what got you there, what you were

19  thinking about when you left and you were gone

20  -- You had time to change your mind.  You had

21  time to put the gun down.  You had time in

22  between the victims or the potential victims

23  that you also shot at.  You had time to ponder

24  and reconsider what you were doing.  Yet, you

25  were focused on completing your task.  That is

26  what you have to look at and explore, painful as

27  **JOSE GUZMAN   E-53800   DECISION PAGE 7   9/13/05**

54

1    it may be for you. And understand and be able

2    to come to this Panel and discuss -- that is

3    what is missing in your presentation. And I was

4    very happy you knew the steps. It kind of

5    surprised me. But I'm very happy that you know

6    them and it sounds like you're using them. That

7    tells me you can be introspective. And we need

8    you to do that tough work. That's what lies

9    ahead for you. And that's why we gave you a

10   multiple year denial. Because that's not

11   something you can do in one year. You've been

12   in prison a long time. You haven't done that

13   work, that's the real job. Anybody can do time.

14   Not everybody can do the real work. And that's

15   what's next for you. So we just encourage you

16   to place yourself in every self-help group that

17   you can get into -- would cause you to look at

18   you, what got you to that terrible crime. And

19   only by understanding that can the Board feel

20   comfortable you may not place yourself in that

.21  position again in the future. You can't just

22   say I'm going to do the steps and God's going to

23   help me. It leaves too much room for possible

24   error in the future. Okay. Sir, I want to wish

25   you good luck. Thank you very much.

26        **PRESIDING COMMISSIONER FISHER:** Thank

27   **JOSE GUZMAN    E-53800    DECISION PAGE 8    9/13/05**

55

1   you.   That completes the hearing.

2                          --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED THREE YEARS

24   THIS DECISION WILL BE FINAL ON _____ JAN 1 1 2006

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JOSE GUZMAN   E-53800   DECISION PAGE 9   9/13/05

56

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Marsha Mees, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1 - 55,
and which recording was duly recorded at
CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of JOSE GUZMAN,
CDC No. E-53800 on SEPTEMBER 13, 2005, and that
the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated September 26, 2005 at Sacramento
County, California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

NAME and NUMBER    GUZMAN, JOSE    E53800    CFFWT2000000205U

CDC 128-B (Rev. 4/74)

On ___10 -21 - 05___ , I, Inmate GUZMAN, CDC# E53800, received hearing transcripts from
(DATE)

the Board of Prison Terms hearing that took place **9/13/2005.**

_Jose Guzman_
Inmate Signature

_(signature)_
Staff Member Signature

INMATE COPY

CTF

GENERAL CHRONO

EXHIBIT    5

44

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER BACHLOR:** We're back on

4    record.

5        **PRESIDING COMMISSIONER MOORE:** Thank you.

6    Let the record show that all interested parties

7    have returned to the room. Jose Guzman, CDC number

8    E- as in Edward 53800. This Panel's reviewed all

9    information received from the public and relied on

10   the following circumstances in concluding that the

11   prisoner is not suitable for parole and would pose

12   an unreasonable risk of danger to society or a

13   threat to public safety if released from prison at

14   this time. Mr. Guzman, the paramount reasoning

15   would be the timing and the gravity of the

16   committing offense. The offense was carried out in

17   a vicious and brutal manner. As well, let me say

18   this, Mr. Guzman, this will be another one-year

19   denial. This is a real convoluted situation that

20   you were involved in. Your wife and son had gone

21   to Mexico for the holiday. You were left in the

22   care of the victim's daughter, Maricela (phonetic)

23   Garcia, who had just given birth to your grandson,

24   and the child of your son. And you were visiting

25   the family on Christmas day and you -- there were

26   indications and you mentioned that you had been

27   **JOSE GUZMAN   E-53800   DECISION PAGE 1   11/4/03**

45

1   drinking for days, days on end.  There were
2   multiple victims attacked, injured, killed in this
3   incident, as Mr. Garcia, your best friend, lost his
4   life in this whole fiasco.  As well, the record
5   shows that you were in love with Maricela and at
6   some point during that evening she had told you she
7   was going to marry somebody else.  The offense was
8   carried out in a manner which demonstrates an
9   exceptionally insensitive disregard for human
10  sufferings.  You were angry.  The motive for this
11  crime was inexplicable and very trivial in
12  relationship to the offense, because this was about
13  anger, rejection, a machismo -- being under the
14  influence of alcohol.  You left the residence, you
15  retrieved a rifle, and you returned and confronted
16  this young lady, Maricela, and her father
17  confronted you, and you subsequently shot him.  As
18  well, if this wasn't bad enough, then you -- the
19  murder of the victim did not deter you, because
20  then you subsequently shot at two other victims,
21  Bertha and Pablo Garcia.  These conclusions are
22  drawn from the Statement of Facts wherein the
23  prisoner caused the demise of Pasquale Garcia and
24  attempted a shooting -- two other individuals in
25  this family, who was your friends, who were your
26  friends, who you were celebrating with.  It's
27  JOSE GUZMAN   E-53800   DECISION PAGE 2   11/4/03

1   frustrating and it's very confusing, Mr. Guzman.
2   Previous record, you had a history of -- an
3   unstable history of tumultuous relationships with
4   others commencing at an early age, around 13 or so,
5   developing a problem with substance abuse of
6   alcohol, as well as a prior criminal history of
7   entering the United States illegally and being
8   deported back in 1970. Institutionally you have
9   been programming very well. No 115s in your
10  entirety, you have no 128s at all. You're doing a
11  positive program in that regard, trying to make
12  development and changes in your educational
13  abilities, just haven't achieved a GED at this
14  time. You have upgraded -- trying to upgrade
15  educationally. I think your score, your TABE, was
16  like 10 point oh or nine point oh totally.
17  However, you have not sufficiently participated in
18  beneficial self-help therapy programming at this
19  time to better understand the causative factors in
20  this particular instance, this particular crime.
21  Psychosocial report was adequate. Parole plans
22  were questionable for us, at least for me anyway,
23  in terms of you have a US INS hold. There was a
24  letter from before, but at this point your mother
25  is deceased. There are no letters from folks in
26  Mexico that will determine or help to clarify your
27  **JOSE GUZMAN   E-53800   DECISION PAGE 3   11/4/03**

47

1    existence in Mexico, being that you don't really
2    have a vocational trade, being that you are in the
3    70s now.  So I need some more clarification on how
4    and who and where -- were properties left to you in
5    that regard, that your mother lived in.  3042
6    notices, opposition to release at this time would
7    be the District Attorney's office of Los Angeles
8    County, present today in opposition to a finding of
9    suitability.  Remarks -- The Panel makes the
10   following findings, that the prisoner still needs
11   some self-help and therapy in order to face,
12   discuss, understand, and cope with stress in a
13   nondestructive manner, as I mentioned, to better
14   understand the causative factors, Mr. Guzman.  As I
15   mentioned earlier, this is -- the situation, how
16   you got yourself in the middle of this, how you got
17   so angry, so frustrated, your machismo, your
18   jealousy that allowed you to take the life of your
19   friend.  And until progress is made, the prisoner
20   continues to be unpredictable and a threat to
21   others.  As I said, this is a one-year -- another
22   one-year denial.  Recommendations are to continue
23   to remain disciplinary-free, which is not a
24   problem, it doesn't appear to be, has never been
25   for you in that regard.  But educationally, to go
26   ahead and complete that GED at this time, whatever
27   JOSE GUZMAN    E-53800    DECISION PAGE 4    11/4/03

48

1    the time is available for you to do so.  And if
2    it's available to you, Mr. Guzman, continue to
3    participate in self-help therapy, whatever may be
4    available, to understand these causative factors,
5  -  as I've mentioned earlier.  This will conclude the
6    reading of our decision today.  Commissioner, any
7    comments to the prisoner?

8        DEPUTY COMMISSIONER BACHLOR:  Mr. Moore --
9        PRESIDING COMMISSIONER MOORE:
10   (Indiscernible).

11       DEPUTY COMMISSIONER BACHLOR:  Sir,
12   Mr. Guzman, do you understand what the
13   Commissioner's telling you about parole plans?

14       INMATE GUZMAN THROUGH INTERPRETER:  Yes.

15       DEPUTY COMMISSIONER BACHLOR:  Okay.  We
16   need to know that you have an actual residence and
17   support in Mexico.  All right?  Otherwise, in my
18   opinion today, you come back with a GED next time,
19   if I were a Panel member, you are very close to a
20   parole date, for me today.  But we have to know
21   where you're going.  All right?  And you do need to
22   give some more thought as to what caused you to
23   commit this crime.  All right?  You're doing very
24   well.  Good luck, sir.

25       PRESIDING COMMISSIONER MOORE:  Mr. Guzman,
26   you're on the right track, you're doing the right
27   JOSE GUZMAN   E-53800   DECISION PAGE 5   11/4/03

49

1    kinds of things, just -- I understand it's

2    difficult -- this was a difficult crime that took

3    place and it's difficult for you to come to grips

4    with it, to be able to confront.  I understand

5    that.  Okay?  But at some point you're going to

6    have to -- need to try to make amends and come to

7    grips or come to terms with what you did.  This

8    will conclude the reading of our decision,

9    Mr. Guzman.  The time is 1020 hours.  Good luck to

10   you, sir.  Stay on the right track.

11        **INMATE GUZMAN:**  Okay, thank you.  Have a

12   nice day and a good one.

13        **PRESIDING COMMISSIONER MOORE:**  Good luck to

14   you, Mr. Guzman.

15        **INMATE GUZMAN:**  Thank you.

16                    --o0o--

17

18

19

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **FINAL DATE OF DECISION** _____ FEB - 2 2004 _____

27   **JOSE GUZMAN    E-53800    DECISION PAGE 6    11/4/03**

50

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CAROL A. EDWARDS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 49, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE GUZMAN, CDC No. E-53800, on NOVEMBER 4, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated November 16, 2003, at Sacramento County, California.

_Carol Edwards_

Carol A. Edwards
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT 6

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**SEPTEMBER 2003 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**AUGUST 28, 2003**

This is a psychological evaluation update for the Board of Prison Terms on inmate Jose Guzman, CDC# E-53800. This report is based on a personal clinical interview of the inmate on 08/28/03. Additionally, in preparation for this report, the Central file, unit health records, and prior reports completed by Steven Terrini, Ph.D., were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

There have been few changes since inmate Guzman's prior psychological assessment, completed by Dr. Terrini in 1998. He has maintained full institutional compliance, and there is no evidence of any disciplinary action throughout his entire incarceration. Inmate Guzman has been attending Alcoholics Anonymous programming regularly for the past 15 years, and has shown clear evidence of motivation to maintain sobriety.

Inmate Guzman is now 73 years old, and his file indicates that he will likely be deported upon release due to an active USINS detainer. He has been married to his wife, Sophia Guzman, for the past 40 years, and she currently resides in Spring Valley, California. Inmate Guzman has four sons and two daughters, and he remains in close contact with his family members.

A majority of inmate Guzman's family, including brothers and sisters, reside in Mexico, and the family has indicated that they will fully support inmate Guzman upon his release.

Inmate Guzman does not fit the stereotype of a habitual criminal. Due to his advanced age, and total institutional compliance during incarceration, he poses an extremely low risk if released to the community. He has openly acknowledged his history of alcohol abuse and poor judgment, and has spent the past 15 years actively working towards change. He has good insight into his prior behavior, and is fully remorseful for his offense.

Due to low risk factors, and close family support, inmate Guzman is appropriate for release, with a negligible probability of recidivism.

**E. W. HEWCHUK, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

**GUZMAN**     **E-53800**     **CTF-CENTRAL**     **08/28/03**     **gmj**

**GUZMAN, JOSE**
**CDC NUMBER: E-53800**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE TWO**

*[signature]*, Ph.D.

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

EWH/gmj

D: 08/28/03
T: 08/28/03